Trish SESTRIC, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–98–123 CR.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 16, 1999.

Decided Oct. 20, 1999.

As corrected Dec. 6, 1999.

Christine Brown, Orange, for appellant.

John Kimbrough, County Atty., Troy Johnson, Asst. County Atty., Orange, for State.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

Appellant was convicted by a jury for having committed the state jail felony offense of Burglary of a Building. *See* TEX. PEN.CODE ANN. § 30.02 (Vernon 1994). Appellant elected to have the trial court assess punishment. Appellant was sentenced to confinement in the State Jail Facility for a term of two years, and assessed a fine of $5,000. The trial court suspended the imposition of appellant's confinement and placed her on community supervision for a period of five years. Appellant brings forth two issues for our consideration, *viz:*

Point 1: The evidence was insufficient to support the conviction.

Point 2: The appellant was wrongly convicted on the uncorroborated testimony of alleged co-conspirators.

The record before us reflects that appellant was tried jointly with co-defendant, Kerry Lynn Fare.[1] Appellant and Fare had been indicted separately for the burglary of the Child Protective Services (CPS) offices located in Orange County, Texas. The offense date was alleged as on or about May 29, 1995. The basic facts are uncontested. The testimony reflected that on the date alleged, someone entered the Orange County CPS offices and removed a large number of word processors, monitors, printers, and other items of office equipment. While the authorities had no suspects initially, a significant circumstance of the burglary was the fact that the building had not been forcibly entered. The assumption at that point was that persons unknown had entered the building by using a key.

The break in the case came in early November of 1995, when appellant's son, Matt Reck, informed the authorities that he participated in the burglary and subsequent secreting of the stolen property. Reck was granted immunity by the Orange County authorities for providing information on the burglary. Reck gave a statement and provided the authorities with an address to a house in Beaumont, Texas, where a large number of word processing equipment was recovered. One particular item, a "tripod box," had the letters "C.P.S." written on it. The owner of the house, David Barrera, cooperated with the authorities and allowed them full access to his house and garage. By the time the instant cases against appellant and Fare went to trial, however, Barrera had died so that any testimony he may have been able to provide was lost.

Included in the information the authorities received from Matt Reck was that of the names of John Hall, Fare, and appellant. At the time of the burglary, Hall was employed with Orange County CPS and Fare was a former employee. The authorities eventually tracked down Hall and he also gave them a statement admitting to participation in the burglary along with Matt Reck, Fare, and appellant.

At trial, the State called both Matt Reck and John Hall to testify against Fare and appellant. The State also called CPS employees Anna Bento and Gail Schlabs, Detective Lynn Thomas Arceneaux of the Orange Police Department, Detective Green D. Moree of the Beaumont Police Department, and Patricia John who was a former house-mate with John Hall. It was through John Hall that Ms. John became acquainted with Kerry Fare and appellant. Other than John Hall and Matt Reck, only two of the State's witnesses had any encounters with either Fare or appellant following the burglary. Those witnesses were Ms. John and Detective Moree. We will discuss the significance of these encounters subsequently.

The case for the defense consisted of a single witness, Earl Eric Bennett. Bennett was a long-time friend of appellant and Fare, and testified that on Memorial Day weekend of 1995, the weekend the burglary occurred, appellant, Fare and Bennett were at appellant's house watching war movies. Bennett further testified that neither appellant nor Fare was gone from the house for any appreciable length of time and they could not have sneaked out because appellant's and Hall's dogs would have made so much noise that Bennett would have been alerted to their comings and goings.

As alluded to above, appellant makes a general legal sufficiency complaint and a more specific complaint that the co-conspirators' testimony was not sufficiently corroborated with other evidence so that said testimony may be included in any legal sufficiency analysis. TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979) provides that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not

---

1. See our opinion in Fare's appeal, *Fare v. State,* 1 S.W.3d 928 (Tex.App.—Beaumont 1999, no pet. h.).

sufficient if it merely shows the commission of the offense. The rationale behind the rule has been explained thusly:

> An accomplice witness is a discredited witness because her or his testimony alone cannot furnish the basis for the conviction. No matter how complete a case may be made out by an accomplice witness or witnesses, a conviction is not permitted unless he or they are corroborated.

*Walker v. State,* 615 S.W.2d 728, 731 (Tex. Crim.App.1981) (citations omitted).

■ The accomplice witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards. *See Cathey v. State,* 992 S.W.2d 460, 462–63 (Tex. Crim.App.1999), *cert. filed.* Nevertheless, the remedy for an appellate finding of insufficient evidence to corroborate accomplice testimony is acquittal since TEX.CODE CRIM. PROC. ANN. art. 38.17 (Vernon 1979) states: "In all cases where, by law, two witnesses, or one with corroborating circumstances, are required to authorize a conviction, if the requirement be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, and they are bound by the instruction."

■ We will discuss appellant's second issue first. In order to determine whether the accomplice witnesses' testimony is corroborated we eliminate all accomplice evidence from the record and determine whether the other inculpatory facts and circumstances in evidence tend to connect the accused to the offense. *See Hernandez v. State,* 939 S.W.2d 173, 176 (Tex. Crim.App.1997); *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993). The non-accomplice evidence need not be sufficient in itself to establish the accused's guilt beyond a reasonable doubt. *Hernandez,* 939 S.W.2d at 176. Nor is it necessary for the non-accomplice evidence to directly link the accused to the commission of the offense. *Id.* The rule is satisfied if there is *some* non-accomplice evidence

which *tends* to connect the accused to the commission of the offense alleged in the indictment. *Id.*

In the instant case, the State's brief sets out six non-accomplice evidentiary situations it contends are contained in the record. These are listed as follows:

1. Appellant, John Hall, and Kerry Fare had discussed burglarizing the CPS office and stealing computers before they committed the burglary;

2. Appellant, Hall, and Fare admitted to the burglary afterwards and admitted that they stole computers from the office;

3. Computers similar to the stolen CPS computers were in Appellant's residence only two months after the burglary;

4. Appellant and Kerry Fare considered the visit and interrogation by Detective Moree in July 1995 to be a "close call" which prompted them to remove most of the computers to another location— Barrera's garage;

5. Kerry Fare was upset enough about her firing to initiate a grievance against CPS and was so emotionally attached to Appellant as to persuade her to help her in her burglary plot; and

6. Earl Bennett's alibi testimony was suspect enough to have created the opportunity for Appellant and Fare to commit the burglary.

■ A careful reading of the record before us does not produce such solid corroborative evidence as the State would have us believe. With regard to any discussions or admissions concerning the burglary by either appellant or Fare, the lone non-accomplice source comes from the testimony of Patricia John. We set out below the pertinent portions of Ms. John's testimony as it relates to any discussions or admissions on the part of appellant or Fare:

Q.[State's Attorney] Sometime around May of '95 did you ever loan John [Hall] a van?

A.[Ms. John] Yes, I did.

Q. What were the circumstances behind that?

A. He asked to borrow my van.

Q. Did you have any idea what he was going to do with it?

A. I really wasn't for sure.

Q. Do you remember him telling you anything about what he was going to do with it?

A. There had been talk about them going to C.P.S. in Orange and taking a bunch of computers, but I really didn't think at the time that John was serious.

Q. And when you say John and them, who are you talking about?

A. Trish and Kerry.

. . . .

Q. Why didn't you take this seriously? I mean, who mentioned this to you?

A. I'm not for sure. I know that John and I had talked about it once at the house on McFaddin but John was working for C.P.S. at the time and I thought, you know, he wouldn't jeopardize his job and his life like that.

Q. Did you— or were you aware of any problems he was having with C.P.S. at that time?

A. No, I wasn't.

Q. Did you loan him the van?

A. Yes, I did.

Q. And did he bring it back?

A. Yes, he did.

Q. When did you find out that what they were talking about was something serious, was something that they weren't joking about, that they did?

A. I don't -- can't actually say, you know, what day; but it wasn't long afterwards.

Q. Was there talk about giving something to you?

A. Yes, there was.

Q. What was that?

A. A computer.

. . . .

Q. Who brought this up about giving you a computer?

A. They did.

Q. Was it afterwards, or was it before? Before you lent them the van or after you had loaned John the van?

A. I don't -- I don't remember.

Q. Were you given a computer?

A. Yes, I was.

Q. All right. Who gave that to you?

A. Well, it actually came from Kerry.

Q. Where did you get it at, do you remember?

A. Well, she showed it to me at her house one afternoon and told me she was having problems getting it booted right but that this was going to be computer for the boys [Ms. John's sons].

Q. Are you much into computers?

A. No. I work on a computer some at work, and I'm always afraid I'm going to tear it up.

Q. Did you know what she meant about booting it up, can't boot it up?

A. No.

Q. What did the computer look like?

A. A computer. You know, I don't know how to describe a computer.

Q. That was a bad question. Let me just see if I can put it this way: Did it look like a new computer, or did it look like an old computer?

A. It looked like an old computer.

Q. Did you have any questions about that computer? Were you a little— did you have some suspicions about where that computer might have come from?

A. Well, I did ask; and they said it came from somebody out west, El Paso or something, that it wasn't one of the computers they had taken.

Q. And who told you that?

A. Kerry.

Q. And when they said computers that they had taken, did you assume the computers they had taken from the C.P.S. office?

A. Yes, sir.

Q. Did they ever deny taking those computers?

A. No, sir.

. . . .

Q. Where were you at their house when they were showing you this computer?

A. In the front room. When you walk in the door, there was a room right there.

Q. Was it downstairs?

A. Yes.

Q. And did you see any other computers besides that computer that was going to go to you?

A. Not that I could recall because it was a dark room.

The following response was further elicited from Ms. John on cross-examination:

Q.[Sestric's Trial Counsel] You said when you testified that you didn't really know what your van was being used for?

A.[Ms. John] No, sir.

Q. What did you think your van was being used for?

A. I just thought, you know, because everybody had small vehicles and I had a large vehicle and a lot of times -- you know, like, now I have a Geo Metro and you can only put four people in it at a time and I occasionally I borrow my girlfriend's van when there is a bunch of us going to the movies or whatever.

Q. But the one who actually borrowed the van from you was John; is that correct?

A. Yes, sir. Yes, sir.

Taken in its proper context, the testimony of Ms. John does not support the State's claim that appellant and Fare discussed burglarizing the CPS office prior to the commission of the offense. What Ms. John testifies to is that she (Ms. John) and John Hall discussed the possibility that Hall, Fare, and appellant would commit the burglary. By her own admission, Ms. John did not know either appellant or Fare very well, and the only time she would see either woman was when Ms. John was with Hall. The State is also incorrect in its claim that the non-accomplice evidence establishes that appellant admitted to having committed the burglary after the fact. Unlike the admission by Fare to Ms. John, we have been unable to locate any non-accomplice witness testimony specifically identifying appellant as having admitted to complicity in the burglary. *See Munoz,* 853 S.W.2d at 563. The State provides us with no record references to such evidence.

█ With regard to the non-accomplice evidence provided by Detective Moree, he testified that in about July of 1995, he happened to be called to appellant's house on an unrelated police matter. While inside the house, Detective Moree stated that he observed a number of computers, printers, and keyboards. The only person Moree identified as being questioned was Kerry Fare. He stated that Fare told him that she (Fare) made her living from working on computers, and that the computers belonged to her clients. Having no reason to doubt her, Moree took Fare's explanation as true. Appellant's name or whereabouts was not mentioned by Moree. When asked by the State if he could say that the computers recovered from David Barrera's garage were the same that he saw in appellant's house in July, Moree responded that he could not. Moree was only able to testify that both sets of computers were "similar" in appearance. Ignoring the accomplice witness testimony *as we must,* Moree's testimony as having observed "computers, printers, and keyboards," absent some detail or distinguishing feature common to those items identified as stolen in the burglary, amounts to virtually no evidence tending to connect either Fare or appellant to the burglary. On a related matter, the State's contention that appellant and Fare considered Moree's July visit and questioning to be a "close call" is not to be found anywhere in the record. Again, the State provides no

reference to the record in support of this contention.

■ As for the State's contention that Fare's filing of a "grievance against CPS," following her dismissal, established proof of Fare's vendetta against CPS, and, thus, appellant's support of her friend's "burglary plot," the non-accomplice testimony of Fare's supervisor at CPS, Anna Bento, provides a somewhat different perspective. Ms. Bento testified to her thoughts and observations, in pertinent part, as follows:

Q.[State's Attorney] Okay. Did she file any type of notice of grievance afterwards [after Fare's employment was terminated]?

A.[Ms. Bento] She had planned to file a grievance, yes.

Q. And did she make that plan know to the people at C.P.S.?

A. Yes.

Q. What had to be done at that point?

A. At that point there is a hearing. There would be a hearing that would be held similar to a court hearing but not a court hearing such as this. Someone from State office comes and conducts the hearing.

Q. Did you-all have to go forward with that type of a hearing?

A. We never did have the hearing, no.

Q. What happened?

A. My understanding is that Ms. Fare withdrew her request to have that hearing.

Q. Okay. And as far as you knew, never went through with the grievance hearing?

A. No.

. . . .

Q. And by the same token—let me just go back to it a second—were all of your conferences and meetings with Kerry Fare, were they all cordial?

A. Yes. I never remember any kind of major discord.

. . . .

Q.[Fare's Trial Counsel] Now, when Kerry was terminated from C.P.S., would you characterize her conduct through that termination— and nobody likes to be terminated.

A.[Ms. Bento] No.

Q. And I would assume that nobody likes to terminate?

A. Right.

Q. Okay. But would you characterize her conduct through that termination as professional?

A. Yes.

Q. She didn't rant and rave at you?

A. No.

. . . .

Q. Even after she was terminated, the process that she took to address the termination such as the grievance process, that was something that was set in place by the Texas department or the main office for employees if they were terminated; is that correct?

A. Right.

Q. So, she was not exercising anything other than what was given to her as an option for objecting to the termination?

A. Oh, absolutely not.

Q. And that was the proper steps to take?

A. Right.

Q. After her termination did she ever call you and threaten you?

A. No.

Q. Even today I notice that you-all still talk in the hall?

A. Yes.

Q. So, I mean, it's not like she hates you or anything else like that. Do you believe that?

A. No.

. . . .

Q. And you don't - - you don't believe Kerry has any animosity towards you, do you?

A. She's never given me any indication of that.

We can find no evidence, either direct or reasonably inferable, from the testimony of

Ms. Bento that indicates any animosity or ill-will on the part of Kerry Fare toward CPS in general, or toward Ms. Bento in particular, as a result of her having been terminated. Nevertheless, the State would have us infer that some ill-will on Fare's part did exist following her termination, and that we impute such ill-will onto appellant. In order to do this based upon the record before us, we would be required to engage in what amounts to some serious inference-stacking. We decline to do so.

■ In light of the record before us, we find that there is simply no non-accomplice evidence that tends to connect appellant, Trish Sestric, with the offense of burglary of a building. Under art. 38.17, appellant must be acquitted. *See Cathey,* 992 S.W.2d at 463, n. 2; *Malik v. State,* 953 S.W.2d 234, 240, n. 6 (Tex.Crim.App.1997); *Munoz,* 853 S.W.2d at 560. Sestric's second appellate issue is sustained.

Also as a result of this finding, we are unable to consider the testimony of Matt Reck and John Hall in our consideration of issue one, whether legally sufficient evidence exists to support Sestric's conviction. Without the testimony of Hall and Reck, the record is devoid of any evidence linking appellant to the burglary of the CPS office, even taking all of the non-accomplice evidence in the light most favorable to the verdict. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim.App.1997). We sustain Sestric's first appellate issue. Because the evidence was legally insufficient to sustain her conviction, the judgment of the trial court is reversed and an acquittal ordered. *See Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

REVERSED AND ACQUITTED.