MICHAEL WAYNE POWELL V. THE STATE OF TEXAS

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-455-CR

MICHAEL WAYNE POWELL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

OPINION ON APPELLANT’S 

PETITION FOR DISCRETIONARY REVIEW

------------

Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion on Appellant’s petition for discretionary review.  
See
 
Tex. R. App. P. 
50.  We withdraw our judgment and opinion dated January 11, 2007, and substitute the following.

This case is before this court on remand from the Texas Court of Criminal Appeals.
(footnote: 1)  A jury convicted Appellant Michael Wayne Powell of burglary of a habitation and assessed his punishment at twenty-eight years’ confinement in the Institutional Division of the Texas Department of Criminal Justice as a habitual offender.  The trial court sentenced him accordingly.  Appellant brought two points on appeal, arguing that the evidence was both legally and factually insufficient to support his conviction.  We held that the evidence was legally insufficient to support the jury’s verdict, reversed the trial court’s judgment, and rendered a judgment of acquittal.
(footnote: 2)  The Texas Court of Criminal Appeals held the evidence legally sufficient to support Appellant’s conviction and remanded the cause to this court to consider Appellant’s remaining point challenging the factual sufficiency of the evidence.
(footnote: 3)  Because we hold that the evidence is factually sufficient to support Appellant’s conviction, we affirm the trial court’s judgment.

The Facts

On July 10, 2002, the complainant returned home to find that her house had been broken into, her property had been stacked near the open front door, and her husband’s wallet was missing.  A vehicle, a Chevrolet Blazer, was in her driveway.  Its back window was broken out.

The complainant testified that when she arrived home, she heard the screen door to the duplex slam.  She testified that her house was a duplex,  “[a]nd it looks like a house from the outside, but it’s got a middle doorway that leads to a hallway to two separate doors.  That front door was closed.  We usually lock it, but I was gonna be right back.  I didn’t lock it.  I just closed it behind me.  And the screen door, you know, it closes automatically.”
(footnote: 4)
 She entered through the screen door and saw that the door to the other half of the duplex was closed but the door to her side of the duplex was “cracked open.”
(footnote: 5)  She saw her television sitting by the front door, so she ran back outside, and then, as she testified, “stalled for a minute.  Because I looked around to see if any neighbors were home.  My neighbor that I do talk to, she’s got dogs, so I couldn’t jump in her yard, you know, and use the phone.”
(footnote: 6)  She did not see any vehicles at any of the other neighbors’ homes, so she ran to the business across the street from the front of her house.
(footnote: 7)  She asked to use the telephone, and the woman who worked at the shop called the police.

A customer was in the shop, and the complainant asked to use his cell phone to call the police because the other woman had given the police the wrong address.  The customer let the complainant borrow the cell phone, and she called the police.  While the complainant was on the cell phone, she walked back across the street toward her house.  She watched her house to see if anyone came out, but no one did.
(footnote: 8)  The complainant also went to her neighbor’s house because the neighbor had come outside.  The complainant asked the neighbor if she had seen anything and if she knew whom the vehicle belonged to, but the neighbor knew nothing.
(footnote: 9)  The complainant stood and talked to her neighbor about “what was going on” while she remained on the cell phone with the police.

At some point while the complainant was talking to her neighbor, a man, later identified as Appellant, came walking up the street toward the complainant and her neighbor.  The complainant testified, “There was a gentleman walking towards me, coming from northbound on Austin.  And he was a white male.  And I figured it was just somebody walking down the street.  Because I live at the corner of Austin and Allen, and there’s always all kinds of people walking.”
(footnote: 10)  She continued, “I thought he was going to walk by, but no.  He approaches me and comes into my yard and tells me to get the — he told me[,] ‘Get the fuck off of the phone,’ you know, ‘and I’ll tell you what the hell is going on.’”
(footnote: 11)  He got into the vehicle, started it, and drove off “going south on Austin.”
(footnote: 12)
 The complainant recorded the license plate number of the vehicle.  Shortly after the complainant called the police, Officer Billy Vyers arrived.  He testified that the complainant verbally told him what the license plate number was and that she did not give him any paper, or, alternatively, that he did not recall her giving him a piece of paper.  He testified that he wrote the number down in his notes from her verbal description.  He then called in a description of the vehicle, including the license plate number, which he read from his notes, and the description was broadcast.

Officer Michael Haley found a vehicle matching the description, including the license plate number, parked in a bank parking lot on Maddox Street.  Within a minute of spotting the vehicle, Officer Haley saw Appellant running in its direction.  Officer Haley then arrested Appellant, who did not respond when  Officer Haley asked if the vehicle belonged to him.
(footnote: 13)  Officer Haley testified that he did not perform a computer search to determine ownership of the vehicle. He also testified that Appellant had been holding keys.  When another officer tried them in the ignition, they started the vehicle.  Inside the vehicle, the police found a letter addressed to Appellant and a pawn shop ticket bearing the name “Pete Perez” and the date July 8, 2002.  The complainant’s sister-in-law’s brother was named Pete Perez, and the complainant identified a photograph of her sister-in-law’s brother from a photo spread.

Officer Haley then returned to the complainant’s residence with Appellant, where the complainant identified Appellant as the person who had cursed at her while she was on the phone but also noted that he was wearing a different colored shirt than when he had cursed at her.

State’s witness Maribel Rodriguez testified that she had seen an Anglo male and a Hispanic male on the street exchanging the shirts they had been wearing.  Rodriguez also testified that the tattoos she had observed on the Anglo male were in the same place as two of those on Appellant, although she could not tell whether they were the same tattoos.  At trial, she was unable to identify Appellant as the man she saw exchanging shirts, explaining that he was quite different from the man she had seen.

No DNA or identifiable fingerprints were found inside the house.  The complainant’s husband’s missing wallet was discovered just south of the west corner of Austin Street, the street on which the complainant lived, and West Maddox Street.

Before Appellant’s trial, Pete Perez pled guilty to committing burglary on July 10, 2002.  In Appellant’s case, the jury was charged on the law of parties.

Standard of Review for Factual Sufficiency of the Evidence

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.
(footnote: 14)  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.
(footnote: 15)  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.
(footnote: 16)
 In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”
(footnote: 17)  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.
(footnote: 18)  We may not simply substitute our judgment for the fact-finder’s.
(footnote: 19)  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”
(footnote: 20)  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”
(footnote: 21)
 An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.
(footnote: 22)
Analysis

Guilt as a Party

Initially, we note that the opinion of the Texas Court of Criminal Appeals remanding this case to our court states, “The court of appeals appears to have incorporated an additional requirement—that appellant is required to actually enter the complainant’s house in order to be found guilty of burglary of a habitation under the law of parties.”
(footnote: 23)  Apparently our opinion was not artfully drafted, for we all know that while 
someone
 must actually enter a home for a burglary of a habitation to occur, a person guilty of burglary as a party must only, “acting with intent to promote or assist the commission of the offense, . . . solicit[], encourage[], direct[], aid[], or attempt[] to aid the other person to commit” the burglary.
(footnote: 24)
 Circumstantial evidence alone may be used to prove that one is a party to an offense.
(footnote: 25)  In determining whether the accused was a party, it is proper to look to events occurring before, during, and after the commission of the offense.
(footnote: 26)  In a circumstantial evidence case, such as this one, it is not necessary that every fact point directly and independently to the guilt of the accused; rather, it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.
(footnote: 27)
 In our prior review of the evidence, we noted not only the evidence that existed, but also the evidence that did not exist.  Because there was no evidence that Appellant personally entered the complainant’s home, we were and are required to examine the record to determine whether there is evidence that Appellant is nevertheless guilty as a party and review such evidence for its sufficiency.
(footnote: 28)
Mere Presence

As we stated in our original opinion, mere presence at the scene of the offense does not make someone a principal or an accomplice.
(footnote: 29)  Some affirmative act or omission is required.
(footnote: 30)  But mere presence is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant.
(footnote: 31)  On the other hand, a person can be an accomplice even if he was never present at the scene of the crime.
(footnote: 32)  However, simply knowing about a crime and failing to disclose it, or even concealing it, does not make someone a party to the crime.
(footnote: 33)
 The mere presence of the accused in the company of an accomplice shortly before or after the time of the offense is not, in itself, sufficient evidence of guilt even if it constitutes corroboration of the testimony of the accomplice.
(footnote: 34)  Courts have rejected guilt by association as corroborating evidence because if “such testimony [placing the defendant and the accomplice together] be corroborative, then accomplices might be held corroborated in their claim of the guilt of any person upon whom they might seek to fasten a crime, by mere proof that such parties had been seen together.”
(footnote: 35)  Association with the admitted criminal may be sufficient corroboration of accomplice testimony, however, if offered in conjunction with other facts and circumstances that sufficiently connect the accused with the commission of the crime.
(footnote: 36)  Examples of such corroborating circumstances include subsequent flight, possession of the fruits of the crime, and presence at or near the scene of the crime at an unreasonable hour.
(footnote: 37)  In this case, the record contains no accomplice testimony.

Application of the Law to the Facts

There is no direct evidence of Appellant’s guilt, either as a principal or as a party.  The brother of the complainant’s sister-in-law was named Pete Perez.  A Pete Perez pled guilty to a burglary committed on July 10, 2002, but the record does not reflect whether he implicated Appellant in those proceedings. No one named Pete Perez testified in the case before us, and consequently no one named Pete Perez provided any inculpating testimony to be corroborated.  The letter addressed to Appellant and the pawn ticket—containing the name Pete Perez, dated two days before the burglary, and found in the same vehicle—to some extent connected someone named Pete Perez to Appellant.

Additionally, Rodriguez saw a Caucasian man and a Hispanic man exchange shirts. The record reflects that she viewed the two men from across Hemphill Street, a four-lane major thoroughfare,
(footnote: 38) and also reflects her following testimony:

A:  . . . .  One was a white guy and the other one was looking Hispanic. 

Q:  Okay. Do you remember what the white guy was wearing?

A:  Yeah.  Tennis shoes, denim pants and a shirt, color blue.

Q:  With [sic] these young men or old men?

A:  Young people.

. . . . 

A:  I saw that the white man was with a big tattoo here (Pointing).  I don’t know it was a name or was letters or what.

Q:  Did he have tattoos anywhere else other than on – other than on his chest?

A:  Yes.  Another one here (indicating).

Q:  On his right arm?

A:  Yes.

Q:  And were you showed [sic] some photos by the police?

A:  No.

Q:  Do you recognize anybody here in court who you saw that day?

A:  I’m going to lie to you if I say yes.

Q:  Okay.  So you do not recognize anybody; is that correct?

A:  No.  Because at that time the white guy was skinny, the hair was like brownish.  The person I see today is different, looking different.

Rodriguez testified that she saw no Chevrolet Blazer and that both men were walking.
(footnote: 39)
 When asked specifically about the tattoo on the man’s chest, she described it as “a little above the belly.”
(footnote: 40)  Later, she described it as a little above the umbilicus.  The photograph admitted as State’s Exhibit 7 shows Appellant with a tattoo extending from his right elbow to the top of his shoulder, across the clavicle from shoulder to shoulder, across the fullest part of the abdomen beginning just above the navel, on the left bicep, and the inside of the left forearm.  She testified, 

Q:  Is it possible – from looking at those photos [of Appellant], is it possible that those are not the same tattoos that you saw that day?

A:  I just saw him two.

Q:  You just saw two tattoos?

A:  At that time, yes.

. . . .

Q:  Now, you’ve looked at those photographs, and those tattoos appear to be in similar locations, is that correct?

A:  Yes.

. . . .

Q:  I cannot say that they were the same because they were in front of me, but they were in the same place.
(footnote: 41)

The complainant said that the man she identified in the show-up was wearing a different colored shirt than when he spoke to her earlier.  There was evidence that Appellant is Caucasian.

Because a reviewing court must consider only the evidence that was before the trier of fact,
(footnote: 42) we must confine our review to the record that was actually before the jury, whether properly or improperly admitted.
(footnote: 43)  We do not consider the evidence that was not before the jury, such as evidence admitted only in pretrial hearings or hearings outside the presence of the jury that was not later admitted for the jury’s consideration. 

Viewing the evidence before the jury in a neutral light, we note that a vehicle was in the complainant’s driveway when she returned to her house.  It had not been there when she left.  When she entered her home, she saw evidence of a burglary, but no person was inside the house.  Appellant later arrived on the sidewalk outside the home, offered to explain everything to her, and drove the vehicle away.  The police found Appellant running toward a vehicle matching the description the complainant gave, and the keys he carried fit the ignition.  The vehicle’s back window was broken out.  A pawn ticket with Pete Perez’s name on it and a letter addressed to Appellant were inside the vehicle.  The only evidence connecting Appellant with the burglary was the presence of the automobile at the scene and the arrival of Appellant later to drive it away.  Although his statement to the complainant may have indicated knowledge that something was amiss, we do not know if his statement referred to the automobile in her driveway or the fact that her home had been entered.  There is no indication that Appellant knew of the burglary before it occurred or even while it was occurring.

The only direct evidence offered concerning the ownership of the Blazer was the officers’ testimony showing that they had no information concerning its ownership:

A.  At that point . . . I asked him, while pointing to the suspect vehicle, was that his vehicle.

. . . . 

Q.  Okay.  And what did he respond — how did he respond?

A.  He did not respond.
(footnote: 44)

. . . .

Q.  Did you ever or did any officer that you’re aware of do a registration or VIN number check on the vehicle to see who it was registered to?

A.  When you run the license plate through our computer, it’ll show you the VIN number and it’ll show you who the last registered owner was.

Q.  Uh-huh.

A.  Is what it’ll show you on the computer.  We routinely, once we get that information from the computer screen, return to the vehicle to check to see if it is indeed the same VIN number.  What it’ll show us is who the last registered owner is.

Q.  Okay.  And you performed that check on this vehicle?

A.  I don’t think I did perform that check.
(footnote: 45)

Nowhere does anyone testify that Appellant said the Blazer was his.  Nowhere does anyone testify that Appellant was its registered owner.

While Appellant had keys that fit the vehicle’s ignition when the police apprehended him, the record does not reflect whether the keys were in Appellant’s pocket, in the ignition, on the vehicle seat, or some other place  when he got into the vehicle to drive it away from the burglary scene, or whether the vehicle had been hot-wired.  The fact that the back window of the Blazer was broken out suggests that the vehicle could have been stolen or used without the owner’s consent.  The record also does not reflect whether more than one set of keys existed.  Although the complainant wrote down the license plate number of the vehicle she saw at her house, no one testified that the license plate on the vehicle the police recovered matched the number that the complainant wrote down.

Neither Appellant’s fingerprints nor his DNA was found inside the house.  No stolen items were found in the vehicle or on Appellant’s person.  No one saw Appellant at the complainant’s house before she saw him walk up to her while she was reporting the burglary.  The complainant described the man she saw as having a shaved head, but Appellant’s head was not shaved.  His hair was short, however.

The State must prove each and every element of the offense beyond a reasonable doubt under the Fourteenth Amendment Due Process Clause.
(footnote: 46)  The State was therefore obligated to prove beyond a reasonable doubt that Appellant personally entered the complainant’s house without consent with intent to commit theft, that he personally entered without consent and did commit or attempt to commit theft,
(footnote: 47) 
or
 that another person entered the habitation with intent to commit theft or did commit or attempt to commit theft, and Appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense of burglary of a habitation.
(footnote: 48)  There must be some evidence that Appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense of burglary of a habitation.  There is none.  We are unable to determine in which of these manners Appellant acted as a party to the offense of burglary of a habitation.

The Court of Criminal Appeals has already determined that the evidence is legally sufficient to support Appellant’s conviction.  Thus, our deferential review of the evidence as mandated by 
Watson
 requires us to assume there is evidence to support each element of the burglary offense.

As we stated above, the Court of Criminal Appeals instructs us that there are two prongs to a factual sufficiency review.  
When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.
(footnote: 49)  We then ask under the first prong of the test whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or, under the second prong, whether conflicting
 
evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.
(footnote: 50)  To reverse under the second prong, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.
(footnote: 51)
 The test for factual sufficiency under the second prong announced by the Texas Court of Criminal Appeals appears to assume the existence of conflicting evidence, that is, evidence supporting a guilty verdict and evidence supporting a not-guilty verdict.
(footnote: 52)  We reach this conclusion because the 
Watson
 court explained, 

We have always held that an appellate court must first be able to say, with some objective basis in the record, that the 
great weight and preponderance 
of the (albeit legally sufficient) evidence contradicts the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial.  We have never, at least until 
Zuniga
, interpreted the factual review jurisdiction of criminal appellate courts to include the ability to overturn a jury verdict and remand for a new trial when the greater weight and preponderance of the evidence actually favors 
conviction
!
(footnote: 53)
 

A factual sufficiency review under either prong of the test assumes some evidence in support of each element of the offense.  
As is his right, Appellant offered no evidence at trial.  
Because Appellant did not contradict the evidence that the State offered before the jury, we do not employ the second prong of the factual sufficiency review.

In conducting a factual sufficiency review that results in remand, an appellate judge “cannot conclude that a conviction is ‘clearly wrong’ or ‘manifestly unjust’ simply because, on the quantum of evidence admitted, 
he
 would have voted to acquit had he been on the jury.”
(footnote: 54)  Reversal is warranted only if an appellate judge can conclude, “with some 
objective
 basis in the record,” that the evidence is factually insufficient.
(footnote: 55)  In other words, the judge must be able to say that no objective person could have convicted on the evidence presented.

We originally held the evidence legally insufficient to support Appellant’s conviction.  That is, we held that no rational trier of fact could have found the essential elements of the offense of burglary, either as a party or as a principal, beyond a reasonable doubt, viewing the evidence in a light favorable to the verdict.  But the Court of Criminal Appeals held the evidence legally sufficient.  Affording appropriate deference to the Court of Criminal Appeals’s determination, we are therefore compelled to hold that the evidence, viewed objectively and in a neutral light, is factually sufficient to support the jury’s verdict.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.

PUBLISH

DELIVERED:  March 8, 2007

FOOTNOTES
1:
Powell v. State
, 
194 S.W.3d 503 
(Tex. Crim. App. 2006)
.

2:
Powell v. State
, 161 S.W.3d 212, 217 (Tex. App.—Fort Worth 2005), 
rev’d
, 
194 S.W.3d 503 
(Tex. Crim. App. 2006)
.

3:
Powell
, 194 S.W.3d at 508.

4:
IV R.R. at 93.

5:
Id. 
at 98.

6:
Id.

7:
Id. 
at 99.

8:
Id.
 at 100.

9:
Id.

10:
Id.

11:
Id.
 at 101.

12:
Id.
 at 103.

13:
Id.
 at 62.

14:
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)
; 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).

15:
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

16:
Watson
, 204 S.W.3d at 417.

17:
Id
.

18:
Id
.

19:
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

20:
Johnson
, 23 S.W.3d at 8.

21:
Id
. at 9.

22:
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

23:
Powell
, 194 S.W.3d at 507.

24:
Tex. Penal Code Ann.
 § 7.02(a)(2) (Vernon 2003).

25:
Wygal v. State
, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977).

26:
Cordova v. State
, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985), 
cert. denied
, 476 U.S. 1101 (1986).

27:
Johnson v. State
, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993), 
cert. denied
, 511 U.S. 1046 (1994).

28:
Tex. Penal Code Ann.
§ 30.02(a)(1) (Vernon 2003) (requiring entry as an element of burglary of a habitation).

29:
Blake v. State
, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).

30:
Id.

31:
Beardsley v. State
, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987).

32:
Id.

33:
Id.

34:
Nelson v. State
, 542 S.W.2d 175, 177 (Tex. Crim. App. 1976).

35:
Weatherred v. State
, 100 Tex. Crim. 199, 272 S.W. 471, 472 (1925). 

36:
Cherb v. State
, 472 S.W.2d 273, 280 (Tex. Crim. App. 1971).

37:
Id.
; 
see also Cawley v. State
, 166 Tex. Crim. 37, 310 S.W.2d 340, 342 (1957), 
cert. denied
, 361 U.S. 920 (1959).

38:
IV R.R. at 172.

39:
Id.
 at 134-40.

40:
Id.
 at 139-40.

41:
Id. 
at 172.

42:
See Santellan v. State
, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (“The appellate court reviews the evidence weighed by the jury . . . .”).

43:
Moff v. State
, 131 S.W.3d 485, 489-90 (Tex. Crim. App. 2004) (“[A]n appellate court must consider all evidence actually admitted at trial in its sufficiency review and give it whatever weight and probative value it could rationally convey to a jury.  Thus, even if the trial court erred in admitting the . . . testimony . . . , the reviewing court must consider that improperly-admitted hearsay.”).

44:
IV R.R. at 61-62.

45:
Id. 
at 84.

46:
Mullaney v. Wilbur
, 421 U.S. 684, 699-700, 95 S. Ct. 1881, 1889-90  (1975); 
In re Winship
, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 1072-73 (1970).

47:
See
 
Tex. Penal Code Ann.
 § 30.02.

48:
See id.
 §§ 7.01, 30.02.

49:
Watson
, 204 S.W.3d at 414
; 
Drichas
, 175 S.W.3d at 799.

50:
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 11.

51:
Watson
, 204 S.W.3d at 417.

52:
See id.

53:
Id.

54:
Id.
 (emphasis added).

55:
Id
. (emphasis added).