

**NUMBER 13-05-714-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**SHERRY LYNN SMITH,**                                                   **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                   **Appellee.**

---

**On appeal from the 278th District Court of Grimes County, Texas.**

---

# O P I N I O N

### Before Justices Yañez, Benavides, and Vela
### Opinion by Justice Benavides

Appellant, Sherry Lynn Smith, was convicted of capital murder and was sentenced to life in prison. TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (Vernon Supp. 2008). Her conviction was based on the testimony of an alleged accomplice, Daniel "Boone" Gardner. On appeal, Sherry argues that, excluding Boone's testimony, the evidence was insufficient to connect her to the crime. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). Additionally, she argues that the trial court erroneously instructed the jury to determine

whether Boone was an accomplice as a matter of fact, when it should have instructed the jury that Boone was an accomplice as a matter of law. By her third and fourth issues, Sherry argues that the trial court failed to instruct the jury that it could not consider extraneous offense evidence unless the jury believed beyond a reasonable doubt that Sherry had committed the extraneous offense. In her fifth issue, Sherry argues that the trial court should have granted a mistrial when the State commented during closing argument on her pre-arrest silence.

We hold that Boone was an accomplice as a matter of law and that the trial court erred when it instructed the jury to determine whether Boone was an accomplice. We also hold that the non-accomplice testimony in this case does not adequately connect Sherry to the crime. Accordingly, we reverse the judgment of conviction and render a judgment of acquittal, and we do not reach Sherry's third, fourth, and fifth issues. TEX. R. APP. P. 47.1.[1]

## I. Accomplice as a Matter of Law or as a Matter of Fact?

Sherry was married to Carey Smith. She lived with Carey and his ailing father, Charles Smith, at their home in Grimes County, Texas. In the early morning hours of Saturday, December 7, 2002, Carey and Charles were shot and killed with a high-powered rifle. At approximately 4:30 p.m., Sherry discovered their bodies at the home and called

---

[1] The dissent states that it would not render a judgment of acquittal because it finds that the evidence tends to connect Sherry to the crime. The dissent is incomplete in that it does not explain how it would resolve the rest of the issues. For example, Justice Vela's dissent does not state whether she joins our resolution of the jury charge error. If Justice Vela agrees with that portion of the opinion, then her dissent should discuss whether Sherry is entitled to a new trial by analyzing whether the jury charge error is harmful. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) ("When the error is properly preserved, a reversal is required if 'some harm' is shown."); *Burns v. State*, 703 S.W.2d 649, 652 (Tex. Crim. App. 1986) (holding that accomplice witness charge error requires reversal and remand for new trial). Furthermore, if Justice Vela believes the jury was correctly charged, she does not address Sherry's remaining issues. By doing so, the dissent deprives Sherry, the State, and the Court of Criminal Appeals the benefit of a proposed resolution of this case.

2

9-1-1 to report the two deaths. Sherry became a suspect and was indicted for capital murder.

Boone is Sherry's ex-husband and the father of her children, and he testified during Sherry's jury trial. Sherry's first argument is that, excluding Boone's testimony, the evidence is insufficient to connect her to the crime. In her second issue, Sherry argues that the trial court erred in instructing the jury to determine whether Boone was an accomplice as a matter of fact. The State urges this Court to first consider whether Boone was an accomplice as a matter of fact or as a matter of law. We will indulge the State.[2]

## A.     Sherry's Reports to the Police

Officer Johnny Martinez testified that he was dispatched to the Smith residence on Saturday, December 7. After he arrived at the Smith residence, he learned that Charles and Carey Smith had been killed. Officer Martinez's supervisor asked him to interview Sherry, so he asked her to accompany him to the sheriff's office for an interview. Sherry agreed to go with him. The interview began at 9:19 p.m. that night and was tape recorded. Officer Martinez testified that Sherry did not express any reservation about talking to him. He testified that before the interview began, he did not discuss any of the particulars of the

---

[2] The State argues that Boone's status as an accomplice as a matter of fact controls the outcome of this appeal—in other words, the State asserts that if Boone was not an accomplice as a matter of law, the State wins and the judgment must be affirmed. That is not the case. The trial court's error in instructing the jury would require this Court to remand for a new trial if we found that the error caused "some harm." *See Herron*, 86 S.W.3d at 632; *Burns*, 703 S.W.2d at 652. In contrast, if, excluding the accomplice-witness testimony, there is no evidence that tends to connect Sherry to the crime, we are required to render a judgment of acquittal. *Wincott v. State*, 59 S.W.3d 691, 703 (Tex. App.–Austin 2001, pet. ref'd). Thus, even if the question of Boone's status as an accomplice was properly submitted to the jury, we would have to determine whether rendition is appropriate by evaluating whether there was sufficient evidence to connect Sherry to the crime. *Badillo v. State,* 963 S.W.2d 854, 858 (Tex. App.–San Antonio 1998, pet. ref'd) (determining that trial court erroneously submitted accomplice witness status to jury, recognizing that remand was required for that error, but then acquitting defendant because non-accomplice witness testimony did not tend to connect defendant to crime). We recognize that we are addressing a remand point before a rendition point, contrary to our customary practice. *See id.* We do so for the benefit of the Texas Court of Criminal Appeals in the event it exercises discretionary review.

3

offenses with Sherry.

Texas Ranger Bryant Wells was present at the interview. He testified that Sherry told the officers that she had been home the night of December 6, babysitting her granddaughter, Logan, until approximately 12:30 a.m. on December 7. Sherry's daughter, Tori Sword, is Logan's mother. After Tori picked Logan up from the Smith residence, Sherry went to bed at 1:00 a.m.

Sherry left the Smith residence at 4:00 a.m. on December 7 and went to the Wal-Mart in Huntsville, Texas. She told the officers that Carey and Charles were asleep when she left. Ranger Wells testified that he retrieved a surveillance videotape from Wal-Mart. Scott Carson, a Wal-Mart employee, testified as to the contents of the videotape. The videotape from Wal-Mart shows that Sherry arrived at 5:15 a.m. in the Wal-Mart parking lot. She remained at Wal-Mart until 6:42 a.m.

Sherry told the officers that after leaving Wal-Mart, she went to the home of her friend, Joretta Mitchell, in Houston. Sherry and Mitchell then went to Northeast Medical Hospital in Humble, Texas, to visit Sherry's cousin, Donnie Helton. Mitchell confirmed that Sherry arrived at her house at about 7:30 a.m. on December 7, and that she went with Sherry to the hospital.

After visiting her cousin, Sherry left the hospital at 1:00 p.m. and drove to the Cingular phone store in Huntsville to purchase a new cell phone. Sherry then went to the Diamond Shamrock where Tori worked. Sherry stated that she went there to pick up Logan so that she could babysit her while Tori worked. Boone was also at the Diamond Shamrock at the same time. Officer Martinez testified that he viewed a videotape from a Diamond Shamrock that was taken on December 7, the day of the murders, at

4

approximately 4:00 p.m. The video shows Sherry, Tori, Logan, and Boone at the Diamond Shamrock.

Sherry told the officers that she left the Diamond Shamrock with Logan and went to Tori's home to pick up some medicine for Logan. She told the officers that she saw Boone again at Tori's house. After that, Sherry left and went to the Smith residence with Logan. She testified that she entered the Smith residence through the garage and walked into the living area. Sherry placed Logan on the floor in the living area with a toy puzzle she had purchased from Wal-Mart. She then went to Carey's bedroom.

Sherry told the officers that when she entered Carey's room, she saw Carey in his bed and noticed that blood was coming out of his nose. She shut the door and then went to Charles's bedroom. She told the officers that as she approached Charles, she believed he was dead. She then went back into the living room and called 9-1-1.

Carolyn Greenwood, a dispatcher for the Grimes County Sheriff's Department, testified that she received a 9-1-1 call from Sherry at 4:30 on December 7. Sherry reported that Carey and Charles were dead, and she was very upset. Sherry was so upset, in fact, that Greenwood had difficulty understanding her. Greenwood asked Sergeant Jim Adkins to speak with Sherry in an effort to calm her down and to prevent her from hyperventilating.

During the interview, the officers questioned Sherry about her relationship with Carey. She told the officers that she had married Carey because "he needed somebody and she needed to be needed." She told the officers that she and Carey slept in separate rooms. She also told the officers that Charles was in poor health.

Ranger Wells testified that Sherry did not cry during the interview. He testified that her demeanor "changed at times." He testified that on occasion, she laughed but also

5

became very serious. At the end of the interview, Sherry agreed to turn over the clothes she had been wearing the day of the murders to Officer Martinez for testing.

On Wednesday December 11, 2002, Officer Martinez and Ranger Wells asked Sherry to come to the station for another interview. A viewing at the funeral home for Carey and Charles was scheduled for later that day, but Sherry nonetheless voluntarily complied with the officers' request. The officers questioned Sherry about her activities on the night of December 6 and the day of December 7, and her statement was consistent with her December 7 statement.

Ranger Wells testified that at some point during the interview, he began to question Sherry about her finances. The officers had learned that Sherry had credit card debt in Carey's name. Sherry admitted that the debt was hers and that Carey did not know about the debt. Initially, Sherry was cooperative. But later in the interview, she became "upset at the process and was less cooperative." At the end of the interview, Sherry got up and left.

**B.      Boone's Testimony**

Boone testified that he married Sherry in 1976. He remained married to her for three years before they were divorced. Sherry and Boone have two children, Tori and Heidi. After their divorce, Boone raised the children, and he remarried.

Boone stated that in the summer of 2002, Sherry was living in Grimes County with Carey and Charles. Boone was staying with Tori, who was single, was raising a child, and was having financial problems. Sherry and Carey had helped Tori financially in the past. Boone testified that during the summer of 2002, Sherry told him that she was helping Tori financially, but Carey did not know the full extent of her assistance. Boone testified that

6

Sherry had obtained credit cards and that Carey did not know about the credit cards.

Boone testified that Sherry said that she was not happy with her marriage to Carey, and she felt "smothered" and "didn't have a life." Sherry told Boone that she would not have anywhere to go if she left Carey. He stated that Sherry was concerned about what Carey would do if he discovered her credit card debt.

Boone said that Sherry called him one day in September 2002 and stated she was having problems with Tori. Sherry told him that she was stressed by having to assist Tori financially, but that she had a solution for the problems. At that time, she did not elaborate.

Boone testified that later that fall, Sherry and Boone were at Tori's home in the front room. Tori was at home, but she was not part of the conversation between Sherry and Boone. Sherry told Boone she was frustrated with her finances and with her marriage. Boone testified that "she just said sometimes she was so frustrated she wanted to kill them." Boone then clarified that, at the time, he believed she was just "blowing off steam."

Boone testified that after that conversation, Sherry discussed killing Carey and Charles again. Sherry reminded Boone that she had a solution to the financial problems:

> Well, it was always something coming up about money. And some time after that when we talked she talked about she could [sic] shoot them. It was some time later that—like I say, the finances always surfaced to the top. And she said I tried to tell you that I had—I had the solution to it but you didn't want to hear it. I said you're right, I don't want to hear it. She said all I need was a set of tire tracks. And I said what do you mean? She said I need a set of tire tracks to be at my house at a certain time. And I said what are you saying? She said that's all I'm saying. I will tell you when I'm not going to be there and I just need somebody to drive up there. She said I will buy you some new tires. I said you're not going to buy me no [sic] new tires.

Boone stated that even after this conversation, he believed that Sherry was blowing off steam, and it did not occur to him to report his conversations with Sherry to Carey and Charles.

7

According to Boone, the week of the murders, Sherry told him that she knew of some guns that he could "get rid of." Boone testified that Sherry knew that he needed money and could sell the guns, but he stated that Sherry did not tell him where she had obtained the guns. Sherry told Boone that she would get back to him.

Two days before the murders, Sherry told Boone that she had some guns and asked what Boone would do with them. Boone told Sherry to bring the guns over to Tori's house and put them on the back of his utility trailer. Sherry said she would be leaving early one morning to visit a relative and would drop them off early in the morning.

Boone stated that on Friday, December 6, 2002, Tori borrowed his truck to go to work. He testified that he was awake when Tori returned late that night. Boone stated that at about 4:30 a.m. on Saturday, December 7, he heard a vehicle drive up to Tori's house. He did not get up to see who it was, however, because there was a gas pump on the property that the landlord sometimes used in the early hours. Boone stated that he went back to sleep.

When he woke up the next morning, the day of the murders, he discovered guns on the back of his trailer. He stated that there was one gun case containing two guns and three guns wrapped in brown freezer paper. One of the guns in the freezer paper was also wrapped in a pale blue colored, terry-cloth bath robe. Boone testified that he hid the guns in an old freezer in the garage. Boone then went inside and got dressed.

Later in the day, Boone returned to the garage to look at the guns. Boone stated that the gun wrapped in the bath robe was a "25.06" with two spent hulls inside it. He said that he thought it was curious that this gun had two spent hulls inside, and it made him think about what Sherry had told him about killing Carey and Charles. He testified that he

8

did not report this to the police, however, because he was scared. Therefore, he put the guns back in the freezer. When asked whether he knew where the guns came from, he stated that he did not know, but he "had a feeling."

Boone said that later that day, he took Tori and Logan to the Diamond Shamrock to meet Sherry. Sherry was going to pick Logan up from the Diamond Shamrock and watch her while Tori worked. Boone testified that when they arrived, Tori and Logan went inside the Diamond Shamrock. Sherry arrived and walked over to Boone's truck. Boone then testified that Sherry said, "I bet you didn't thank [sic] I could do it did you." Boone said that he told Sherry that he did not want to talk about it. He said he was in disbelief. Tori then came outside the Diamond Shamrock with Logan. Sherry told Boone that she was going to Tori's house to pick up a jacket or medicine for Logan, and she left with Logan.

Boone left the Diamond Shamrock and went to Tori's house. When he arrived, Sherry was there with Logan. Sherry told Boone that she was going home to the Smith house. Boone asked Sherry if Logan needed to stay with him, "if there was anything that Logan didn't need to see." He testified that Sherry said, "Logan is not going to see nothing [sic]." Sherry told Boone that she was going to call him when she got home so that he could come pick up Logan. Sherry then left with Logan.

A short time later, Sherry called Boone and said that she needed him to come pick up Logan. He stated that Sherry was "in a panic." Boone then went to the Smith home. The police were there when Boone arrived, and Logan was in the back of Sherry's truck. Boone told the police who he was, and he took Logan and put her in the front seat of his truck.

The police then questioned Boone while he smoked a cigarette. He did not talk to

9

Sherry at that time. He testified that the police questioning did not last very long. After answering questions, he left with Logan and went back to Tori's house. Boone testified that after he returned to Tori's house, Tori called him on the phone and was hysterical. Later that night, Sherry and her parents came to the trailer. Boone testified that he did not talk to Sherry about the guns at that time. Boone left Tori's house and did not stay there that night.

The day after the murders, Boone spoke to Sherry in the morning. Boone testified that Sherry told him that she had killed Carey and Charles. Boone told Sherry not to tell him about it, but Sherry insisted that she needed someone to talk to. Boone said that a few weeks later, Sherry told him that she hated lying about the murders and that it was becoming very difficult for her to keep lying.

Boone stated that at some later date, Sherry discussed the murders in detail with him. She told him that she shot Carey first and that Charles had awakened. She said that Charles opened his bedroom door to ask her about the noise, and she told him that he was hearing things and to go back to bed. She told Boone that after Charles went back to sleep, she entered his room and shot him in the chest. She told Boone she was wearing a robe at the time of the murders.

After the murders, Sherry took the guns and put them in her truck. Apparently, the police confiscated Sherry's truck during the investigation. Boone testified that Sherry was worried that the police kept the truck for such a long time because gun powder or blood may have been present in the back of the truck.

Boone testified that he and Sherry spoke to Tori about talking to the police. He said they told Tori to be careful about what she said to the police. When asked what he did

10

with the guns, Boone stated that he wrapped them in a tarp and buried them under the garage at Tori's house. He stated that he burned the paper and the bath robe that the guns were wrapped in. Boone stated that when Sherry asked him about the guns, he told her that she did not need to worry about the guns because he had gotten rid of them. Later, Boone moved the guns to a travel trailer that he owned in Shepherd. After that, Boone took two of the guns to San Antonio and left them with a friend, Bruce Shipman. He said he moved the "25.06 . . . [b]ecause I knew that was the gun that she used to kill them with."

Boone testified that on March 5, 2003, the police came to Tori's house and executed a search warrant to look for credit cards, credit card receipts, and credit card statements. Sherry was at the house at the time the police arrived. The police discovered that Boone was in possession of methamphetamine, and he was arrested. The police also recovered several guns that belonged to Carey Smith. Boone was taken to jail and was interviewed by the police. After his arrest, he told the police that Sherry had killed Carey and Charles. He also told the police where to find the guns that Sherry had given him. Boone denied killing Carey and Charles.

Boone revealed that he was incarcerated at the time of his testimony. On direct examination by the State, Boone explained that he was testifying pursuant to a plea agreement:

Q:      All right. What are you in jail for right now? What are you charged with?

A.      Currently?

Q:      Uh-huh.

A:      Felon in possession of a firearm, possession of a controlled

11

substance.

Q: Okay. Did you have some other charges previously pending against you that are dismissed now?

A: Yes, sir.

Q: And what was that?

Q: Capital murder times two.

Q: Okay. Now you're testifying today under a plea agreement, right?

A: Yes, sir.

Q: All right. I want you to tell the jury what that plea agreement is?

A: Plea agreement is to plead to tampering with evidence or felon with a firearm. I'm on probation. It would be run concurrent with it.

Q: Let's back up. You're on probation where?

A: In Kimball County.

Q: Do you know what you're on probation for?

A: I thought it was felony theft.

Q: Okay. So you're on probation in Kimball County and you have two other felony charges here. And what is going to happen on those charges if you—as part of your agreement to testify?

A: I've got TDC time coming.

Q: How much?

A: Two years.

Q: You going to get credit for the time you have been in jail?

A: Yes, sir.

Q: So, you got two years confinement with about twenty months credit?

A: Yes, sir.

12

Q:    And what about the Kimball County case?  Is there an agreement to take care of that, also?

A:    Yes, sir.  To run concurrent.

Q:    That means that it all runs together.

A:    Yes, sir.

Q:    So the net effect is you're going to get two years in prison and you have already done twenty months of it?

A:    Yes, sir.

The defense then called Boone during its case in chief.  Defense counsel also inquired into the plea bargain:

Q:    You already made your deal haven't you?

A:    Yes, sir.

Q:    You went, did you not, from a capital murder times two indictment to going home in March don't you?

A:    Yes, sir.

      . . . .

Q:    And the reason you sung like a canary is because you were in the ringer on March 5th, 2003, weren't you?

A:    I was in the what?

Q:    In the ringer?

A:    In the ringer?

Q:    You bet you.  You're fixing to go down weren't you?

A:    Yes, sir.

Q:    You going back—you going to the pen weren't you?  Weren't you?

A:    Yes, sir, I guess so.

13

## C.     The Jury Charge

When the trial court presented its proposed jury charge to the parties, Sherry objected that the proposed charge included an instruction that Boone was an accomplice as a matter of fact instead of as a matter of law. She also requested an instruction that Boone was an accomplice as a matter of law. The trial court overruled the objection, refused Sherry's requested instruction, and instructed the jury to determine whether Boone was an accomplice as a matter of fact:

> You are instructed that you cannot find the defendant guilty based upon the testimony of an accomplice witness unless that testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense.
>
> An "accomplice witness" is a person who has participated with someone else before, during, or after the commission of the crime for which the defendant stands charged. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it. "Corroborate" means to confirm. In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.
>
> . . . .
>
> Now, therefore, if you find from the evidence that Daniel Glen Gardner, AKA Boone Gardner, is an accomplice witness, then you cannot convict the defendant based upon his testimony; unless such testimony is corroborated by other independent evidence which tends to connect the defendant with the crime charged; and then you must believe his testimony is truthful and shows the guilt of the Defendant as charged in the indictment; and from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against her; or, if you have a reasonable doubt thereof, you will acquit the defendant.

The jury found Sherry guilty, and the trial court assessed punishment at life in prison.

## D.     The Accomplice Witness Rule

The accomplice witness rule is a statutorily imposed requirement—it is not derived

14

from federal or state constitutional standards. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Korell v. State,* 253 S.W.3d 405, 409 (Tex. App.–Austin 2008, pet. filed). Texas Code of Criminal Procedure article 38.14 provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.14.

The reason for the accomplice witness rule is that "the testimony of an accomplice witness is inherently untrustworthy and should be received and acted on with caution because it is 'evidence from a corrupt source.'" *Korell*, 253 S.W.3d at 405 (quoting *Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App.1981)). In particular, the accomplice witness rule recognizes that "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Blake v. State* 971 S.W.2d 451, 454 (Tex. Crim. App. 1998). As Wigmore explained,

> [t]he reasons which have led to this distrust of an accomplice's testimony are not far to seek. He may expect to save himself from punishment by procuring the conviction of others. It is true that he is also charging himself, and in that respect he has burned his ships. But he can escape the consequences of this acknowledgment, if the prosecuting authorities choose to release him, provided he helps them to secure the conviction of his partner in crime.

7 Wigmore, Evidence § 2057 (Chadbourn rev.1978), at 417; *see Korell,* 253 S.W.3d at 409 n.3.

The jury is the judge of the credibility of the accomplice witness. *Blake,* 971 S.W.2d at 454. However, the jury must be appropriately instructed as to how it may consider the testimony. If a witness's status as an accomplice is established as a matter of law, the trial court is required to instruct the jury that it may only consider the accomplice's testimony

15

if it also finds sufficient evidence that tends to connect the defendant to the crime. *Id.* at 455; *see also Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). If the evidence demonstrating that the witness was an accomplice is conflicting, or there is some doubt that the witness was an accomplice, the trial court must include the definition of "accomplice" in the instructions and instruct the jury that if it finds that the witness is an accomplice, it may consider the accomplice's testimony only if it first finds there is evidence tending to connect the defendant to the crime. *Blake*, 971 S.W.2d at 455.

### E.     Was Boone an Accomplice as a Matter of Fact or as a Matter of Law?

An "accomplice" is a person who "participates before, during, or after the commission of the crime." *Id.* at 454. The court of criminal appeals has held on numerous occasions that "a person is an accomplice if he or she could be prosecuted for the same offense as the defendant, or a lesser included offense." *Id.* at 454-55. An indictment for the same or a lesser included offense is not necessary to a finding that the witness was an accomplice—what matters is whether the evidence in the record shows that the witness *could* have been prosecuted with the offense. *Id.*

Saying, however, that an indictment is not *necessary* to a finding of accomplice-witness status is not to say that it is not *sufficient* to support such a finding. In fact, both the State and Sherry agree that Texas law is well-established in this regard—when a witness testifies and is under indictment for the same offense or a lesser included offense, the witness is an accomplice as a matter of law. *Druery,* 225 S.W.3d at 498; *Cocke v. State,* 201 S.W.3d 744, 747-48 (Tex. Crim. App. 2006)*; Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991) (citing *East v. State*, 702 S.W.2d 606, 616 (Tex. Crim. App. 1985)); *Adams v. State*, 180 S.W.3d 386, 415 (Tex. App.–Corpus Christi 2005, no pet.).

16

Additionally, both parties agree, and it is well-established law, that when a witness has been charged with the same offense as the defendant, but the indictment is dismissed pursuant to a plea agreement under which the witness agrees to testify against the defendant, the witness remains an accomplice as a matter of law even though the indictment is no longer pending. *Blake*, 971 S.W.2d at 462 (Mansfield, J., dissenting) (citing *Stiles v. State*, 232 S.W. 805, 806 (1921)); *Durham v. State,* 7 S.W.2d 92, 93 (Tex. Crim. App. 1928); *Oates v. State,* 86 S.W. 769, 771-72 (Tex. Crim. App. 1905); *Barrara v. State,* 42 Tex. 260 (Tex. 1874); *Jones v. State,* 195 S.W.3d 279, 290 n.12 (Tex. App.–Fort Worth 2006), *aff'd*, 235 S.W.3d 783 (Tex. Crim. App. 2007); *see also Burks v. State,* No. 04-01-00041-CR, 2002 WL 1758292, at *4 (Tex. App.– San Antonio July 31, 2002, no pet.) (not designated for publication); *Sanchez v. State*, No. 04-97-00285-CR, 1998 WL 876924, at *3-4 (Tex. App.–San Antonio Dec. 16, 1998, pet. dism'd) (not designated for publication). *But see Moore v. State,* 984 S.W.2d 783, 786-88 (Tex. App.–Waco 1999, no pet.)

Sherry argues that Boone was indicted for the capital murder of Carey and Charles and that Boone testified as part of a plea bargain with the State to reduce his charges.[3] Therefore, he was an accomplice as a matter of law. The State concedes that Boone was charged with the murders,[4] but it argues that the charges were dismissed for insufficient

---

[3] At oral argument, Sherry's counsel stated that if this Court believes that Boone did not testify in exchange for a reduced sentence, then the Court "must also believe in the tooth fairy."

[4] At oral argument, the State responded to Sherry's argument by stating that "a grand jury would indict a ham sandwich."

evidence before Sherry's trial, pointing to testimony from Officer Johnny Martinez.[5]  The

State argues that there is no evidence in the record to demonstrate that Boone was

testifying pursuant to a plea agreement whereby his charges were reduced in exchange

for his testimony against Sherry.  The State points to several cases that have held that

when a co-indictee's charges have been dismissed, and there is no agreement with the

State to testify against the defendant in exchange for the dismissal of the charges, the

witness is no longer an accomplice as a matter of law.  *See Garza v. State*, 296 S.W.2d

267, 269 (Tex. Crim. App. 1956); *Burks,* 2002 WL 1758292, at *4 ("If the indictment is not

dismissed in exchange for testimony against the accused, the witness is not an accomplice

as a matter of law."); *Edwards v. State*, No. 03-97-00587-CR, 1999 WL 959166, at *10

(Tex. App.–Austin Oct. 21, 1999, no pet.) (not designated for publication).  In other words,

the State retains control over the witness's status so long as there is no plea bargain that

requires the accomplice's testimony against the accused.  Thus, under these

circumstances, the State argues that Boone was not an accomplice as a matter of law.

We disagree with the State's characterization of the evidence below.  The record

indicates that Boone testified pursuant to a plea agreement, and there is no support in the

record before us that the charges against Boone were dropped for "insufficient evidence."

Officer Martinez testified that before Boone gave his statement implicating Sherry, Boone

asked whether he could get out of jail if he talked to the police.  Officer Martinez denied

making Boone any promises, but he admitted telling Boone that "it depends on what you

---

[5] We note that in *Blake v. State*, the court of criminal appeals expressed concern with the State's apparent ability to manipulate the accomplice witness rule by delaying or foregoing proceedings against an accomplice witness.  *Blake v. State,* 971 S.W.2d 451, 457-58 (Tex. Crim. App. 1998).  We question the validity of the State's position in light of *Blake,* but we need not decide the propriety of such tactics, as the analysis that follows demonstrates.

18

tell us." As set forth above, Boone was also examined extensively about his plea bargain with the State. He candidly admitted that he was testifying "under a plea agreement." Moreover, when defense counsel asked if Boone "sang like a canary" because he was "fixing to go down," Boone agreed.

The only evidence in the record that the State points to in support of its argument was testimony from Officer Martinez, but contrary to the State's argument, Officer Martinez did not testify that the State's case was dismissed for insufficient evidence. In fact, he disclaimed any knowledge of the status of Boone's charges. During his examination, the following exchange occurred:

Defense: And Daniel Boone Gardner was indicted?

. . . .

Defense: On two counts of capital murder, was he not, for the death of Carey Smith and Charles Smith?

Martinez: I know he was indicted. I'm not sure exactly what day it was.

Defense: Okay. But it was for capital murder was it not? For Carey and Charles Smith?

Martinez: I believe it was.

. . . .

State: You're aware that Daniel Gardner's indictments were dismissed for insufficient evidence?

Martinez: No, I was not.

State: Okay.

. . . .

Defense: Nobody discussed that with you?

Martinez: No, sir.

19

Defense:     The dismissal?

Martinez:     I had no idea.

Because the evidence in the record clearly demonstrates that Boone was charged with the capital murders of Carey and Charles, and that those indictments were dismissed in exchange for a guilty plea to other offenses and in exchange for Boone's testimony, Boone was an accomplice as a matter of law. *Durham,* 7 S.W.2d at 93; *Stiles*, 232 S.W. at 806; *Oates,* 86 S.W. at 771-72; *Jones,* 195 S.W.3d at 290 n.12; *see also Burks,* 2002 WL 1758292, at *4 (not designated for publication); *Sanchez*, 1998 WL 876924, at *3-4 (not designated for publication). Accordingly, the trial court erred in allowing the jury to determine Boone's accomplice status.

## II. Evidence Tending to Connect Sherry to the Crime

We next determine whether, excluding Boone's testimony, there was evidence that tended to connect Sherry to the crime. "In conducting a sufficiency review under the accomplice-witness rule, a reviewing court must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) (citing *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993)). The inquiry is whether the evidence "tends to connect" the defendant to the crime, not rational sufficiency to support a finding of guilt. *Id.* In other words, the corroborating evidence need not be sufficient by itself to establish guilt. *Id.* "The non-accomplice evidence does not have to directly link appellant to the crime, nor does it alone have to establish appellant's guilt beyond a reasonable doubt; rather, the non-accomplice evidence merely has to tend to connect appellant to the offense." *Burks*

20

*v. State*, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994) (citing *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988)). If the evidence does not meet this standard, the conviction must be reversed and a judgment of acquittal must be rendered by the trial court. *Munoz v. State*, 853 S.W.2d 558, 564 (Tex. Crim. App. 1993); *Ex parte Reynolds*, 588 S.W.2d 900, 902 (Tex. Crim. App. 1979); *Sestric v. State*, 1 S.W.3d 921, 924 (Tex. App.–Beaumont 1999, no pet.).

The State contends that Sherry had the motive and opportunity to kill Carey and Charles and that her demeanor and actions before and after the murders tend to connect her to the crime. The State also focuses on (1) testimony regarding the bath robe and the freezer paper that was wrapped around the guns Sherry allegedly gave to Boone, (2) testimony regarding Boone's sale of the guns after the murders, and (3) crime scene forensics.

### 1. Evidence of Motive and Opportunity

First, the State argues that Sherry had a motive and the opportunity to commit the murders. The State theorizes that Sherry was in a loveless marriage of convenience, was hiding credit card debt from Carey, and stood to inherit all the Smiths' property. It reasons that Sherry was afraid that Carey would find out about the credit card debt and that Sherry was falling back in love with Boone. Thus, Sherry had a motive to kill Carey and Charles—money and a way out of her marriage. Additionally, the State argues that Sherry was the last person to see Carey and Charles alive, that Sherry was at home around the time of the murders, and that Boone never left Tori's house the night of the murders. According to the State, comparing Boone's time-line to Sherry's time-line, it was impossible for Boone to commit the murders.

21

The State offered testimony from Debra Cargill, who was a home respiratory therapist responsible for monitoring a breathing machine for Carey. Carey had been diagnosed with obstructive sleep apnea. Cargill testified that prior to the murders, she went to the Smith residence. She testified about a conversation that she had with Sherry:

Q:    Okay. And at that point did [Sherry] make any comment that you remember?

A:    Yes. I just expressed how nice the place looks and she made the statement that one day this would be hers.

Q:    Okay. And did she say anything else beyond that?

A:    You know, I thought maybe I misunderstood her, and then in my mind I thought well, maybe something is going on with Carey.

. . . .

Q:    What was her demeanor when she talked to you about [Boone]?

A:    She seemed somewhat happy.

Q:    But you didn't go into deep discussion about that?

A:    Well, she mentioned that she—there was a time where I think Carey and his dad had been sick and, you know, she was just tired. And she mentioned that she wanted to—this was I don't think related to [Boone], but wanted to just go somewhere and get away. Which I didn't think was strange because, you know, she had a lot of responsibility and she just wanted to get away. And she made the statement that she needed to get away, whether she had to go with everybody sick or not, she just needed that break to get away.

Q:    Okay. And when she made the statement to you about this was all going to be hers, did she talk about anything else in that regard or—

A:    Well, she mentioned the equipment outside; hay balers, other equipment.

Q:    Did she say anything else about that?

A:    She did. But you know, at the time it was so unusual that I was in my mind trying to understand what was going on and trying to rationalize

22

as to, like I said, maybe that Carey was sick or—I was trying to understand all of this.

Jerry Simcik was also a home health care nurse who was responsible for caring for Charles. Simcik testified about Sherry's relationship with Carey:

Q:    And during the time period that you were going to the home did you have a chance to observe Mrs. Smith's interaction with [Charles]?

A:    Several times.

Q:    All right. And what kind of relationship did you see between [Charles] and [Sherry]?

A:    There was a lot of tension. There was a lot of stress in the household. She would get irritated with Charley. . . .

Fred Neal testified that he was related to Charles and Carey and was also the family's attorney. He testified that in 2001, he prepared a will for Carey. At that time, Carey was married to Sherry. The will left all of Carey's property to Sherry and made her the executor. Several years earlier, he had prepared a will for Charles. Charles's will left everything to his wife, Eileen, if she was living. Because Eileen predeceased Charles, the will provided that Carey would inherit the Smith residence. Neal testified that because Charles and Carey died at approximately the same time, Carey would not inherit anything from Charles. The Smith residence would pass to Carey's brother under a residual clause. Neal opined, however, that to a lay person, the wills indicate that if Charles died, his property would pass to Carey, and if Carey died, the property would pass to Sherry.

Teresa Knott testified that she was a member of the same church that Charles and Carey attended. She testified that Charles was in poor health, and that Sherry and Carey shared responsibility for caring for Charles. She testified that caring for Charles became stressful for Sherry as his needs increased. She also testified about Sherry's relationship

23

with Carey:

Q:      Did Sherry ever talk to you about Carey?

A:      Yes.

Q:      Did she ever describe him to you physically or give you an explanation about their relationship?

A:      Yes.  You know, his size.  She explained they sleep in separate bedrooms, partially because of his size.

Finally, Tori testified.  She testified that she was three or four years old when Sherry and Boone divorced, and she lived with Boone after the divorce.  Tori stated that after Logan was born, she set up a travel trailer outside the Smith residence to be close to Sherry.  The travel trailer remained on the Smith property for approximately three or four months during 2001.  Thereafter, Tori moved to a mobile home down the road, where she was living at the time of the murders.  Sherry and Boone were cooperating to help Tori financially.  In July or August 2002, Boone began staying with Tori at the mobile home a couple of weeks out of the month.  Boone helped Tori with the rent and electric bills.  Sherry babysat Logan while Tori worked.

She testified that Charles was in poor health and that Sherry cared for him.  Sherry also told Tori that Charles "wasn't going to live much longer."  Tori said that whenever Charles went to the hospital, which he did occasionally, Sherry tried to prepare Tori for the possibility that Charles may die.  Sherry told Tori that when Charles passed away, Carey would not live much longer, and "everything would be hers."

Tori testified that Sherry's marriage to Carey was one of convenience.  She stated that Carey and Charles needed Sherry to take care of them, and Sherry felt "needed."  At first, Sherry seemed content with her situation.  Tori stated that later on, Sherry was

24

"frustrated" and "wasn't very happy" with Carey and Charles because they called "picking all the time asking for her to come home and when is she coming home." She testified that Sherry did not like the fact that they were keeping tabs on her. Tori stated that when Carey called her house looking for Sherry, Sherry "talked kind of ugly" to him. Tori said that on one occasion, Sherry discussed leaving Carey, but she "didn't know where she would go or what she would do" because "she didn't have a job." Sherry told Tori that Carey was not in good health and that he was "big and fat."[6]

Tori testified that when Boone first started staying with her, Sherry stayed away from Tori's house. But after some time, Sherry started to come over more frequently. Tori testified that later on, Sherry "always wanted to be where [Boone] was. She also wanted to talk to him and just kind of follow him around. And he was—like she really wanted his attention." Tori testified that Sherry told her that she had kissed Boone and that she still loved him. Tori testified that the week after the murders, both Boone and Sherry stayed at Tori's house but in separate bedrooms.

Tori also stated that Sherry had obtained credit cards in Carey's name, and Sherry used the credit cards to help Tori financially. The bill for one of the credit cards was sent to Tori's house, and Tori believed that this particular credit card was in Sherry's name. The State introduced tape-recorded statements wherein Sherry admitted to having several credit cards that Carey did not know about. According to the State's exhibits, the credit card debt totaled over $42,000.00, and Sherry was behind on the payments.

With regard to Sherry's opportunity to kill Charles and Carey, Tori testified that on

---

[6] The medical examiner, Doctor Joni McClain, testified that Carey was 5 feet and 11 inches tall and weighed 385 pounds.

December 6, 2002, she worked at the Diamond Shamrock from 4:00 p.m. until after midnight. Tori stated that Sherry babysat Logan that night. At 12:45 a.m., Tori finished working, and Sherry called, asking where she was. Tori stated that Sherry was mad because she had to leave early in the morning to go to Huntsville. Tori stated that it was unusual for Sherry to be angry about Tori's lateness. Tori said she went to the Smith residence around 1:00 a.m., and Sherry brought Logan out to the truck.

Tori said that after leaving the Smith residence, she went home. Boone was there when she arrived. She stated that she went to bed about 2:30 or 3:00 a.m., and she believed that Boone went to bed around the same time. She stated that around 5:00 or 6:00 a.m., she heard Boone stirring in the kitchen, but she went back to sleep after that and slept until 10:00 a.m. Tori stated that when she woke up, Boone was still there. Boone's truck was a diesel, and if he had left during the night, Tori believed she would have heard the truck. She did not hear the truck start during the night.

On cross-examination, however, Tori admitted that she could not be sure that Boone had stayed at her house the entire night. Tori testified Boone had a four-wheeler at her house that was working at the time of the murders. She testified that if someone had started the four-wheeler, she would not have heard it.

Sherry concedes that the evidence in the record shows that she had a motive and the opportunity to commit the crime. She argues, however, that this evidence alone is not enough to corroborate Boone's testimony. We agree. While motive and opportunity may be considered along with other factors, the Texas Court of Criminal Appeals has repeatedly held that motive and opportunity alone are insufficient to corroborate an accomplice's testimony. *Reed*, 744 S.W.2d at 127; *Paulus v. State*, 633 S.W.2d 827, 846 (Tex. Crim.

Ap. 1981). As Sherry points out, when the spouse of a murder victim is a suspect in the case, there will almost always be some evidence that could be used to show a motive and an opportunity to kill the victim. For example, spouses frequently craft their wills to leave all their property to the other spouse, and quite a few people are in loveless marriages of convenience. Furthermore, spouses typically have the most access to the other spouse, and therefore, the most opportunity to commit a crime against a spouse. If this type of evidence alone was sufficient to convict a spouse, our jails would be full of husbands and wives who were beneficiaries under their spouse's will and did nothing more than express dissatisfaction with their marriage on occasion. Moreover, although evidence of an affair during marriage may provide a motive, an affair alone is not enough to connect that person to his or her spouse's death. *See Reed,* 744 S.W.2d at 126-27. Thus, we will not consider this evidence unless there is something more in the record that tends to connect Sherry to the crime.

The dissent concedes that evidence of motive and opportunity alone is not sufficient to connect Sherry to the murders. Nevertheless, the dissent points to several variations of this type of evidence that it argues independently establish Sherry's connection to the murders. First, the dissent argues that the "presence of the accused with the accomplice witness, when coupled with other circumstances, may be sufficient corroboration," citing *Dillard v. State*, 550 S.W.2d 45, 51 (Tex. Crim. App. 1977) and *Nelson v. State*, 542 S.W.2d 175, 177 (Tex. Crim. App. 1976). It argues that Sherry was in Boone's presence on numerous occasions before the murders, on the day of the murders, and after the murders; therefore, this fact tends to connect Sherry to the murders.

The important part of the quoted language is "*when coupled with other*

27

*circumstances.*" For example, in *Dillard*, the defendants were arrested for robbery less than fifteen minutes after the robbery occurred. 550 S.W.2d at 49. At the time of the arrest, the defendants were with the accomplice witness a short distance away from the location of the robbery, and one of the defendants had $75 in his pocket, which was the exact amount of money taken during the robbery. *Id.* Thus, in that case, the defendant's presence with the accomplice witness immediately after the robbery was significant when viewed in light of the other evidence which included the fruits of the crime. *Id.* at 51.

In *Nelson,* the court further explains when and how an accused's presence with the accomplice before or after a crime can be used as corroborating evidence. 542 S.W.2d at 177. In that case, the defendant was accused of burglary of a building and arson. *Id.* at 176. When investigating the burglary and arson, the police determined that a medallion was missing from the building. *Id.* The defendant and an accomplice witness were questioned at the accomplice witness's home, and the police noticed the missing medallion laying in the yard several feet away from both the defendant and the accomplice witness. *Id.* The defendant was convicted based on the accomplice witness's testimony. *Id.* On appeal, the defendant argued that his mere presence with the accomplice was insufficient to connect him to the crime, and the Texas Court of Criminal Appeals agreed. *Id.* at 177.

The court held that the mere presence of an accused with an accomplice witness before or after a crime is insufficient to tend to connect the defendant with the crime. *Id.* It may only be considered if other suspicious circumstances are present. *Id.* For example, the court noted that "[t]he record is devoid of any additional evidence of an inculpatory nature tending to connect the accused with the commission of the offense of burglary of a building or the offense of arson, such as being in the company of the accomplice near

28

the scene of the crime at the time of its commission at an unusual hour, flight or actual possession of stolen property." *Id.* The court held that merely discovering the fruits of the crime in a yard several feet away from the defendant was not enough to sustain the conviction, and the court reversed. *Id.*

Here, Sherry was admittedly in Boone's presence on numerous occasions before and after the crime. She has a child and a grandchild with the man. Sherry and Boone were both assisting Tori. There is nothing unusual or suspicious about her presence with Boone on these occasions, and there is a reasonable explanation for her presence.[7] *See Leal v. State,* 782 S.W.2d 844, 852-53 (Tex. Crim. App. 1989) (holding contact with family members not corroborating evidence)*; Morin v. State,* 960 S.W.2d 132, 136 (Tex. App.–Corpus Christi 1997, no pet.) (holding that evidence that appellant was with accomplice on day of murder proved nothing because the "two were friends who saw each other almost daily"); *Cf. Thomas v. State,* 993 S.W.2d 392, 393, 396 (Tex. App.– Eastland 1999, no pet.) (holding that unreasonableness of the hour and a lack of apparent reason for defendant's presence with accomplices near crime scene can furnish sufficient corroboration). As for the fact that Sherry may have carried a torch for Boone, this is merely motive evidence. Accordingly, we will not consider it unless there is something more in the record.

---

[7] Courts reject "guilt by association" as corroborating evidence because if "such testimony [placing the defendant and the accomplice together] be corroborative, then accomplices might be held corroborated in their claim of the guilt of any person upon whom they might seek to fasten a crime, by mere proof that such parties had been seen together." *Powell v. State,* 219 S.W.3d 498, 505 (Tex. App.–Fort Worth 2007, pet. ref'd) (quoting *Weatherred v. State*, 100 Tex. Crim. 199, 272 S.W. 471, 472 (1925)). This is precisely what we believe happened in this case.

Second, the dissent argues that "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *See Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Again, there must be "other suspicious circumstances" that would allow the Court to consider this evidence. *Id.* For example, in *Brown*, the court found that the "suspicious circumstances" surrounding the defendant's presence at the scene of the crime included that the defendant repeatedly circled the park where the robbery took place, appeared to panic and then drove away when the police appeared, and denied being with the accomplice witnesses that morning when questioned by a police officer. *Id.*

The dissent reasons that because Sherry was at home for approximately three hours while Charles and Carey slept, and because Charles and Carey were found murdered in their beds, Sherry placed herself at the crime scene relative to the time of the murders. Sherry lived in the house with Charles and Carey. *See Cruz v. State,* 690 S.W.2d 246, 251 (Tex. Crim. App. 1985) (holding appellant's presence on victim's property was insignificant because appellant lived on premises). Sherry had a perfectly legitimate reason for being at the house in the middle of the night. *Id.* The fact is that the time of death was never established with any certainty at trial. The murders could have easily occurred after Sherry left the home and went to Wal-Mart. *See Badillo v. State,* 963 S.W.2d 854, 859 (Tex. App.–San Antonio 1998, pet. ref'd) (holding fact that witness saw defendant at store during day when murder occurred did not corroborate accomplice witness testimony where State did not show the time of the murder and accomplice witnesses' testimony was inconsistent as to time of murder). Accordingly, there are no

30

additional "suspicious circumstances" surrounding her presence at the Smith home. *See Brown,* 672 S.W.2d at 489. The dissent's argument is a mere recitation of her opportunity to commit the murders, which without more, is not sufficient to connect Sherry to the murders.

## 2. Sherry's Demeanor and Actions Before and After the Murders

Second, the State argues that Sherry (1) did not act as a normal person would act on the day of the murders because she went to Wal-Mart at 4:00 a.m.; (2) acted unusually upon discovering the bodies; (3) was aware that guns were missing from the house and that Charles and Carey had been shot before that information was officially released to her; (4) did not act like a grieving widow after the murders and was attempting a relationship with Boone, and (5) told her daughter Tori to be careful of what she said to the police.

### a. Sherry's trip to Wal-Mart at 4:00 a.m.

The State argues that Sherry acted unusually because she went to Wal-Mart at 4:00 a.m. the morning of the murders. Wal-Mart surveillance established Sherry's presence that morning, and the evidence demonstrated that Sherry purchased several items. Although the State does not specifically argue as much, the dissent reasons that the "logical conclusion from Sherry's conduct . . . is that she was trying to establish an alibi." The dissent cites *Beathard v. State*, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989). We disagree with the dissent's analysis.

The establishment of an alibi is not the only reason that people go to Wal-Mart at 4:00 a.m. Wal-Mart obviously has enough customers throughout the night to justify remaining open 24 hours a day. It is equally as logical that someone would go to Wal-Mart early in the morning when they have a busy day ahead and lack any other time to do their

31

shopping. In fact, that is exactly the reason that Sherry provided for her trip to Wal-Mart—she was traveling to Houston that day to visit a sick relative.

*Beathard* does not require a contrary conclusion. 767 S.W.2d at 430. In *Beathard*, the defendant was accused of assisting his accomplice in murdering the accomplice's family. *Id.* at 424. The accomplice testified that he and the defendant traveled to Nacogdoches the day of the murders and went to the Stephen F. Austin University library to check out books in order to establish an alibi for the day of the murders. *Id.* at 425. The defendant had formerly been a student at the university. *Id.* The defendant's girlfriend testified that on more than one occasion, "she heard [the defendant] and [the accomplice] discussing a plan to commit the 'perfect murder.'" *Id.* at 429. She testified that the defendant had not been to the library since he dropped out of school; nevertheless, he went to the library the week of the murders. *Id.* at 430. The court held that "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Id.* "While not independently sufficient to corroborate [the accomplice's] testimony, [the girlfriend's] testimony provides a 'suspicious circumstance' which tends to corroborate the testimony by suggesting the existence and implementation of a plan." *Id.*

The defendant's trips to the library were insignificant without the testimony from the defendant's girlfriend that he and his accomplice had a plan to commit murder. *Id.* There is no such testimony in this case. No one, other than Boone, testified that Sherry had a plan to commit murder. Accordingly, *Beathard* does not require this Court to find that Sherry had a "plan" to commit murder merely because she went to Wal-Mart early in the

32

morning.

### b. Sherry's Actions Upon Discovering the Bodies

The State argues that Sherry did not act as a normal person would have acted because when she first entered Carey's room, she believed him to be dead but never checked him or touched him. During the December 7 interview, Sherry told the officers that she had not fully entered the bedrooms to touch the bodies to confirm that they were dead. The State argues that the crime scene photographs in the record show that it would have been very difficult for a person to know that Carey was dead by just looking through the doorway. The State reasoned that Sherry could not have known that Carey and Charles had been shot by merely entering the bedrooms.

Contrary to the State's arguments, State's Exhibit 14 is a photo of Charles's room as it was discovered by the police, while State's Exhibit 15 is a photo of Carey's room as it was discovered by the police. Officer Todd Greene testified that both photos show the view from the hallway of the Smith residence and reflect the views that a person would have if they had not fully entered the bedrooms. While State's Exhibit 14 has a dark contrast and is not very clear, blood spatter is clearly visible on the pillow underneath Charles's head. State's Exhibit 15 is unclear as to whether any blood was visible from the hallway.

Sherry explained to the officers, however, that she saw blood coming out of Carey's nose. Additionally, Officer Martinez testified that when he first entered the crime scene and walked into Carey's room, he noticed a small pool of blood coming from Carey's facial area. When he entered Charles's room, he saw blood on the bed and blood pooling on the floor. He stated that as he walked toward Charles, he knew that he was "obviously

33

deceased" and that "he had some type of injuries to his chest." That the crime scene photos, taken by the police, may tend to hide the extent of the victims' injuries is not evidence that tends to connect Sherry to the crime, particularly in light of the other testimony from the police officers regarding Sherry's report and the officers' own views of the crime scene. *See Paulus,* 633 S.W.2d at 844 (evidence must do more than "point the finger of suspicion towards an accused").

The dissent argues that this case is similar to *Reed v. State*, 744 S.W.2d at 127. We disagree. In *Reed*, the defendant was accused of killing his wife. *Id.* His accomplice testified that after murdering his wife, the defendant pushed her "face first" out of a vehicle onto the side of the road. *Id.* Later, after the body was discovered, a detective took the defendant to the location of the body so that he could identify her. *Id.* The detective testified that the victim's clothing was up around her head, her face was turned away from the defendant, and her hair covered her face. *Id.* The defendant approached the body until he was about six or seven feet away, and he identified her without ever seeing her face. *Id.* Another officer opined that viewing the body that way, a person could not tell if the victim was male or female and could not have known the victim's identity. *Id.* at 127-28. The court relied on this evidence, along with substantial other corroborating evidence, to sustain the conviction. *Id.*

Contrary to the dissent's argument, Sherry did explain to the police why she believed Cary and Charles were dead when she viewed them in their beds. Sherry told the officers that she saw blood coming from Cary's nose. Officer Martinez admitted that he saw the blood as well. Neither the crime scene photos nor any other evidence in the record supports the State's theory that Sherry could not have known that Carey and

34

Charles were dead except if she killed them herself. Accordingly, this evidence does not tend to connect Sherry to the crime.

### c. Sherry's Knowledge of the Missing Guns

Next, the State argues that Sherry knew that guns were missing from the house before anyone told her. Deputy Angela Schroeder interviewed Sherry when she first arrived on the scene on December 7. She testified that Sherry mentioned guns in the house but discussed them in the past tense. Deputy Schroeder testified that she never told Sherry the guns were missing. Furthermore, at the December 7 interview with the police, the officers asked Sherry what guns might have been present at the house. Sherry described several guns, including one that was in a black gun case in the utility room. Officer Martinez told Sherry that there was no black gun case found at the residence. Sherry then stated, "The guns are gone, aren't they?" The State argues that this question indicates that Sherry knew the guns were gone before anyone told her.

Sherry's question, however, does not reveal that Sherry was in possession of facts that only the killer would know. *See Wincott v. State*, 59 S.W.3d 691, 700-01 (Tex. App.–Austin 2001, pet. ref'd) (holding that because defendant was part of group of friends that included alleged accomplice, his knowledge of certain facts about the crime did not necessarily indicate guilt); *cf. Green v. State*, No. 14-03-00276-CR, 2004 WL 612956, at *4 (Tex. App.–Houston [14th Dist.] Mar. 30, 2004, pet. ref'd) (not designated for publication) (holding evidence sufficient to corroborate where defendant's recorded conversations with accomplice indicated specific knowledge of the facts of the crime and defendant's fear that the phones were tapped). Rather, Sherry's question appears to be a logical, follow-up question, given the fact that she knew that Carey and Charles were

dead, that the officers were asking questions about the location of the guns, and that the officers informed her that a gun case was missing. Accordingly, we hold that her statements do not connect her to the crime.

The dissent argues that Sherry knew about and had access to the guns in the Smith home. It further argues that "a comparison of the bullets recovered from the murder victims to those bullets from the guns recovered from Boone showed that the recovered bullets from the guns had the same general characteristics as the 25.06 rifle recovered from the accomplice, Boone, and that the recovered bullets could have come from the 25.06 rifle."

The court of criminal appeals has expressly rejected this type of testimony. As the court explained in *Beathard*, corroborating evidence must do more than confirm a detail of the accomplice's story. 767 S.W.2d. at 428. It must corroborate a fact that tends to connect the defendant to the murders. *Id.* This is a very important distinction because of the nature of accomplice witness testimony. Evidence from non-accomplice witnesses that merely corroborates details of the accomplice witness's story does not always connect the defendant to the crime—in many cases, it will only show that the accomplice was aware of the details of the crime, which will always be true if the accomplice participated in or committed the crime himself. *Id.*; *see also Badillo,* 963 S.W.2d at 858. In *Beathard*, the court rejected several pieces of evidence because it only corroborated a detail of the accomplice's story. *Beathard*, 767 S.W.2d at 428. For example, the accomplice testified that several items were taken from the victims' residence, and the State located those items exactly where the accomplice said they would be found. *Id.* The court held that while this evidence corroborated details of the accomplice's story, it did not connect the

36

defendant to the crime. *Id.*

The court distinguished this type of situation from one where the defendant's version of the events, with regard to a particular detail, was directly contrary to the accomplice's version of the events. *Id.* at 430. "Independent evidence which generally tends to prove that an accomplice witness's version of events is true, rather than the version given by the defendant, is considered corroborative, even if it concerns a mere 'detail,' as opposed to a substantive link between the defendant and commission of the offense." *Id.*

For example, in *Beathard*, the accomplice testified that the defendant was wearing overalls, a t-shirt, and a pair of tennis shoes. *Id.* The accomplice claimed that the defendant said that he would dispose of the shoes so that any footprints from the scene could not be matched to his shoes. *Id.* at 431. The defendant expressly denied that he made this statement and denied that he had ever owned a pair of shoes like the ones described by the accomplice. *Id.* The defendant's girlfriend, however, "confirmed [the accomplice's] description of [the defendant's] dress and said that, since the day of the murder she had never again seen these articles of clothing." *Id.* The court considered the girlfriend's testimony as corroborative, but the only reason that the girlfriend's testimony was corroborative was because the defendant expressly denied owning shoes or clothing similar to those described by the accomplice. *Id.*

In this case, the fact that the guns taken from the Smith house were recovered from Boone and may have been used to commit the murders does nothing more than corroborate a detail of Boone's story. Sherry did not deny that the guns were taken from the home. We must be extremely cautious in relying on Boone's testimony because of his motive to exonerate himself from his own criminal liability. Accordingly, we attach no

significance to this evidence.

### d. Sherry's Demeanor After the Murders

Additionally, the State argues that Sherry did not act like a grieving widow after the murders. Essentially, the State argues that Sherry did not cry during her interviews with the police.

Ranger Wells testified that Sherry did not cry during her interviews, and she even laughed on occasion. Tori testified that she went to pick Sherry up from the police station the night of the murders. She testified that Sherry was "really, really messed up. Like maybe she had taken a bunch of her anxiety pills. She wasn't crying at that point or anything." Sherry left with Tori and went to Tori's house that night. Tori said that Sherry did not cry much the day after the murders. She also testified that her mother's reactions were not typical of someone who was grieving.

We are hesitant to attach a particular significance to this testimony because we recognize that people deal with grief in many different ways. This evidence is entirely too speculative to connect Sherry to the murders. *See Paulus,* 633 S.W.2d at 844

### e. Sherry's Statements to Tori Regarding Police Questioning

The State argues that Sherry told Tori to be careful of what she said to the police, and this indicates a consciousness of guilt that connects Sherry to the murders. Tori was questioned on the Monday after the murders. Tori testified that she was scared to be questioned by the police because she did not want the police to think that Sherry had anything to do with the murders, and Sherry warned her to be careful of what she said to the police:

> A:     I know that I didn't want to because it terrified me, you know. It terrified me that anybody would think that she had anything to do

38

with—

Q: What made you think that they thought she had something to do with it?

A: Because they had her there questioning her first. And then—at some point it was said to watch what I say.

. . . .

Q: What did she say to you in regards to you being interviewed by the police?

A: Well, I expressed that I didn't want to—you know, this was so hard for me. I didn't want to do it again. And she and my dad actually told me that I didn't have to.

Q: Okay.

A: And at some point or another she—they all actually told me to watch what I'm saying because anything I say could make her look guilty when she is not.

Q: So when you say they all, who is they all said that?

A: She and my dad and my grandmother. I don't know if it was put exactly like that from her, but it was just—

[Defense counsel]: Your Honor, I object to what grandmother said as hearsay.

THE COURT: Sustained.

Q: [By the State] When you say all, specifically Boone and your mother?

A: Yes, sir.

Q: And they said watch what you say because it may make your mother—how did they say it?

A: Anything that I say can incriminate my mom.

On cross-examination, Tori clarified that Boone was more concerned with her statements to the police:

39

Q:     They didn't tell you what to tell the police did they?

A:     No.  Not what to tell them.

Q:     They told you you didn't have to talk to them if you didn't want to. Isn't that what they said?

A:     Correct.

Q:     And they also told you been [sic] careful what you say?

A:     Correct.

Q:     They told you not to offer, volunteer information but answer questions?

A:     Correct.

Q:     No one told you to answer questions falsely did they?

A:     No.

        . . . .

Q:     And, in fact, I believe you indicated in your statement of March 28 that it was Boone who was the more serious about making sure that you didn't cooperate with the police fully.  Isn't that what you told them?

A:     Yes, sir.

Q:     In fact, he got that stern look with you and told you and you knew when he meant business because you grew up with him?

A:     Yes, sir.

Q:     And he would get that attitude about him didn't he?

A:     Yes, sir.

Q:     And not Sherry did she?  Well, who did you point out to the police that had the stern look?

A:     My dad.

Tori later clarified that Boone was concerned that she would say something to incriminate

40

Sherry, not Boone.

Tori further testified that after the police executed the search warrant at her house in March 2003, Sherry and Boone were both arrested. Tori spoke to Sherry on the phone while she was in jail. Sherry told Tori that she still loved Boone, and she wanted to know what Boone had said while he was in jail. Sherry told Tori that the police were trying to turn them against each other and trying to "make them talk."

We disagree that Sherry's statements indicate a consciousness of guilt that tends to connect her to the murders. As demonstrated above, the record actually indicates that Sherry and Boone told Tori to watch what she said to the police because it could make Sherry look guilty "when she was not." In fact, Tori clarified that Boone was the most concerned with Tori's statements to the police. Tori testified that both Boone and Sherry told her to testify truthfully and did not encourage her to lie. Sherry did not threaten Tori or ask Tori not to testify. Under these circumstances, Sherry's statements to Tori do not connect Sherry to the murders. *See Wincott*, 59 S.W.3d at 703 (holding that defendant's actions asserting his innocence and requesting accomplice to admit he was lying did not indicate consciousness of guilt).

### 4.     The Bath Robe and Freezer Paper

The State further argues that testimony regarding the bath robe and the freezer paper in which the guns were wrapped when given to Boone connected Sherry to the murders. First, the State points to Boone's testimony that the 25.06 rifle and two spent shell casings were wrapped in a bath robe. Next, the State points to Tori's testimony regarding what Sherry was wearing the night before the murders. Tori testified that when she picked Logan up from the Smith residence on December 6, Sherry was wearing a

41

house coat. She said it "was something [Sherry] normally wore." Tori testified that it was a pale, cotton or terry cloth robe that zipped up the front. She said it was a thick fabric. Tori stated that after the murders, she never saw the robe again.

On cross-examination, Tori admitted that in prior statements to the police, she had given inconsistent accounts about what Sherry was wearing the night of December 6. First, she told police that Sherry was wearing comfortable clothes, like sweat pants. Later, she told the police that Sherry was wearing a thin, see-through robe. She clarified that she had been describing a robe that her former step-mother had worn when she was growing up. The only other testimony in the record regarding the bath robe was Boone's testimony that the guns Sherry delivered to him were wrapped in a bath robe. With regard to the freezer paper, Officer Martinez testified that he found brown freezer paper at the Smith residence.

We are not at liberty to give this evidence the credence the State attaches to it. The only testimony linking the bath robe and the freezer paper to the murder weapons in this case came from Boone, and we must disregard his testimony. Without Boone's testimony, the fact that Sherry was wearing a bath robe the night of December 6 and that freezer paper was found in the Smith house is inconsequential and does not tend to connect Sherry to the crime. *Id.* at 700 n.7 (holding that testimony from defendant's girlfriend that defendant drove a black truck similar to accomplice's description of get-away vehicle did not corroborate accomplice's testimony—only accomplice's testimony, which had to be disregarded, linked vehicle to crime). We are particularly skeptical of this alleged connecting evidence given that both the bath robe and the freezer paper used to wrap up the guns after the murders were never recovered because they were allegedly destroyed

42

by Boone.

The dissent again cites to *Beathard*, arguing that this is "independent evidence that generally tends to prove that an accomplice witness's version of the events is true, rather than the defendant's version." 767 S.W.2d at 430. And the dissent again misreads *Beathard.* As explained above, evidence that corroborates a mere detail of the accomplice's story is only relevant if that particular detail is expressly denied by the defendant. *Id.* That is not the case here. Sherry never denied wearing a bath robe the night of the murders. In fact, Tori testified that the bath robe was something that Sherry usually wore. Sherry further did not deny that the Smith residence had freezer paper available. And Boone would have likely known this fact. The dissent's argument merely points to a detail of Boone's story that Boone could have known merely because he participated in the murders himself. Accordingly, we attach no significance to this testimony.

### 5.    The Sale of the Guns

The State reasons that Sherry was aware of and was assisting Boone in selling the guns from the Smith residence after the murders. Tori testified that a couple of weeks after the murders, Boone told her that he had a gun he wanted to sell. Boone asked Tori to call a couple of gun shops to see if they purchased guns. Tori said that Sherry was present when Boone discussed selling the guns. Tori stated that a couple of days after that, Sherry was looking in the phone book for gun shops, and she assumed that Sherry was helping Boone for the same reason.

The testimony is not clear with regards to Sherry's involvement. As stated above, Tori merely testified that on one occasion, Boone told her that he had some guns to sell,

43

and Sherry was present at that time. The testimony does not indicate what guns Boone was attempting to sell, nor does it indicate that Sherry was actually paying attention at the time that Boone spoke to Tori. Tori assumed that Sherry was helping Boone sell a gun—she had no personal knowledge of that fact. This testimony is too speculative to connect Sherry to the crime. *See Paulus,* 633 S.W.2d at 844.

### 6. Crime Scene Forensics

Finally, the State argues that crime scene forensics tended to connect Sherry to the crime. Ray Cooper testified that he is a firearm and tool mark examiner. Cooper tested the bullets that were recovered during the autopsies of Charles and Carey, and he compared those bullets to the guns recovered from Boone. He opined that the bullets recovered from the medical examiner had the same general characteristics as the 25.06 rifle recovered from Boone, and that the bullets could have come from the 25.06 rifle. However, he qualified his testimony by stating that the bullets were damaged such that there were not enough marks to positively state that the bullets came from that rifle.

Crime scene photos show that Carey and Charles were likely killed in their sleep. The State asserts that Carey must have been killed first because the noise would have awakened him if Charles had been killed first. Thus, the shooter must have been someone that Charles expected to see in the early morning hours and who could convince him to go back to bed.

Additionally, the police collected the clothes Sherry was wearing on the day of the murders. The clothes were submitted for laboratory testing. Staci Dennison testified that she is a forensic biologist. She explained that she tests items submitted to the laboratory for the presence of blood or seminal fluid. She said that she performs two types of tests:

44

a presumptive test and a confirmatory test.  A presumptive test examines the item for a

chemical property found in blood that is also found in other items.  Dennison explained that

a presumptive positive for blood means that the substance could be blood, but it is not

conclusive.  She testified that rust, horseradish, cocktail sauce, and other substances

would also test positive.  Dennison testified that she performed a presumptive test on the

outside of Sherry's pant leg, and it tested positive for traces of blood.

Dennison testified, however, that the trace amounts were too small to perform a

confirmatory test on the pants.  She stated that performing a confirmatory test on the stain

could destroy the sample and could eliminate the possibility of DNA testing.  Therefore, the

pants were sent for DNA testing, instead.

Kenneth Balagot testified that he is a forensic biologist, and he performed DNA

testing on the sample from Sherry's jeans.  He testified that he created DNA profiles for

Carey, Charles, and Sherry.  He testified that the DNA from that sample was a mixture of

two contributors that could be divided into a major and a minor contributor.  He stated  that

the set of genetic markers from the major contributor "matches" Sherry's DNA profile.  He

testified that the minor contributor's profile  "corresponded" to genetic markers observed

in Carey's DNA profile.  He testified that there was a 1 in 195 chance that Carey was a

contributor to the DNA.  Charles was excluded as a source of the DNA.  Balagot admitted

that it is impossible to tell when or how DNA was transferred to an object.  He also testified

that it is not unusual for two people who live together to have each others' DNA on their

clothing.

At most, the State's witnesses demonstrated that the 25.06 rifle recovered from

Boone may have fired the bullets that killed Carey and Charles, that there *might* be blood

on Sherry's pants, and that there was a 1 in 195 chance that Carey contributed part of the DNA found in that same location. The fact that the 25.06 recovered from Boone might have been used to kill Charles and Carey does not connect Sherry to the murders unless Boone's testimony is considered. Accordingly, we may not consider it. *See Wincott*, 59 S.W.3d at 700 n.7.

Furthermore, the State's witnesses admitted that it was likely that one spouse would have the other spouse's DNA on their clothing merely from living in the same home. Given that Sherry cared for both Carey and Charles and lived in their house, the State's forensic evidence was too equivocal to connect Sherry to the murders. *See Bagwell v. State,* 956 S.W.2d 709, 711-12 (Tex. App.–San Antonio 1997, no pet.) (holding that forensic testimony regarding pattern of injuries victim sustained was too equivocal to connect defendant to the crime).

The dissent argues that the stain on Sherry's clothing is a circumstance that tends to connect Sherry to the crimes. The dissent cites to *Gosch v. State*, 829 S.W.2d 775, 781 (Tex. Crim. App. 1991) and *Romero v. State*, 716 S.W.2d 519, 523 (Tex. Crim. App. 1986). These cases are a far cry from being on point. First, in *Gosch,* the defendant was charged with capital murder. *Gosch*, 829 S.W.2d at 776. The defendant was accused of kidnapping the victim, who was the wife of a bank president, asking for ransom money from the victim's husband, and then killing her. *Id.* at 776-81. At trial, a forensics expert testified that blood smeared on the defendant's jeans contained type "A" blood, while the defendant had type "O" blood. *Id.* at 781. The court considered this, along with several other items of corroborative evidence, as sufficient to connect the defendant to the crime. *Id.* at 782. Significantly, in *Gosch*, the defendant had no connection to the victim. *Id.* And, in *Gosch,*

46

the blood was "smeared" on the defendant's jeans. *Id.*

Second, in *Romero*, the defendant was charged with killing the alleged victim while attempting to sexually assault her. 716 S.W.2d at 520. Three other men were also indicted for the offense, and one of the co-indictees testified for the State. *Id.* at 520-21. The defendant argued that the co-indictee's testimony was not corroborated. *Id.* The court of criminal appeals disagreed, however, relying in part on the defendant's confession which placed him at the scene of the crime during the criminal episode. *Id.* at 523. The police also found a pair of the defendant's underwear that contained blood stains consistent with the defendant's and the victim's blood type. *Id.* The court held that these two pieces of evidence sufficiently corroborated the co-indictee's testimony. *Id.* Again, the defendant had no connection to the victim other than the crime. *Id.* And it appears from the opinion that there was no doubt that the stain on the defendant's underwear was, in fact, blood. *Id.*

The present case is much, much different. Smith lived with Charles and Carey. The stain on her pants was too small to perform any conclusive tests. In fact, the police could not even conclusively say that the stain was blood. The State's evidence showed that most spouses' clothing would contain the other spouse's DNA, and the State did not even show that the DNA (1) was a result of blood being on the pants, or (2) that the DNA was definitely Carey's DNA. Under these circumstances, we disagree with the dissent that the forensic evidence was sufficient to connect Sherry to the crime.

We also disagree that the cumulative force of the evidence was enough to connect Sherry to the crime. Because none of the other elements urged by the State connected Sherry to the crime, we may not consider the evidence regarding Sherry's motive and

opportunity. *See Reed*, 744 S.W.2d at 127; *Paulus*, 633 S.W.2d at 846. There simply is nothing in the record that tends to connect Sherry to the murders. Sherry's second issue is sustained.

### III. Conclusion

Excluding the accomplice witness testimony from consideration, there was insufficient evidence tending to connect Sherry to the crime. Accordingly, we reverse the judgment of conviction and render a judgment of acquittal. *See Wincott*, 59 S.W.3d at 703. We express no opinion on Sherry's remaining issues. Tex. R. App. P. 47.1.

GINA M. BENAVIDES,
Justice

Publish.
Tex. R. App. P. 47.2(b).

Dissenting Opinion by
Justice Rose Vela.

Opinion delivered and filed this
the 13th day of November, 2008.